# CASES DETERMINED

BY THE

# SUPREME COURT OF NEW MEXICO,

## JANUARY TERM, 1883.

THE TERRITORY OF NEW MEXICO, Appellee, v. MILTON J.
YARBERRY, Appellant.

*January, 1883.*

MURDER.   (1) *Indictment, in whose name to be found.*

SAME.   (2) *Practice on review: Objections to grand and petit jurors* **not**
*considered.*

SAME.   (3) *Evidence, statements of prisoner before and after committing* **the**
*crime not part of res gestæ: Rule as to res gestæ.*

SAME.   (4) *Instruction as to reasonable doubt held properly refused.*

SAME.   (5) *Evidence of conversation prior to shooting held not admissible.*

PRACTICE.   (6) *Exceptions to charge of court, must be specific.*

MURDER.   (7) *Instruction as to nature of crime.*

PRACTICE.   (8) *Matters outside of record not reviewable.*

NEW TRIAL.   (9) *Not granted for newly discovered evidence merely cumu-*
*lative.*

MURDER.   (10) *Assessment of punishment by jury.*

MURDER.   (11) *Trial: Presence of accused necessary:* (12) *and* **will be**
*presumed.*

1.   An indictment for murder found in the name of the territory of
New Mexico for a violation of territorial law, is proper.   It need not
be in the name of the United States of America, for a violation of a
United States statute.

2.   Objections to grand and petit jurors not taken until after trial and
conviction for murder, cannot be considered by the Supreme Court
on appeal.

The defendant Yarberry, on trial for murder, was a peace officer
whose duty it was to disarm persons carrying concealed weapons.

[391]

Shortly after hearing a shot in the street in the evening, he went out in company with two other men, Yarberry making some remark just before the three went in the direction of the shot. Then going on, Yarberry found the deceased, Campbell, a stranger to him, and unarmed, slowly leaving the place where the shooting occurred. Yarberry called upon Campbell to stop and to hold up his hands, and at the same instant he and one of his companions, Boyd, immediately commenced firing at Campbell, who fell forward on his face and instantly expired, pierced by six balls, all from behind—all entering his back. Yarberry, without going near the body of the deceased, turned and went into a saloon. At this place, four or five minutes after the shooting, the sheriff asked Yarberry " What is the trouble, Milt ?" to which he made some reply. At the trial, counsel for defendant asked witnesses three questions, which were ruled out by the court, as to what Yarberry said when he and his companions started to go to the scene of the shooting, what he said in reply to the sheriff's question, and what he said just prior to the shooting.

*Held,* that the questions were properly disallowed, what the defendant said at the times mentioned not being part of the *res gestæ.* The cries of bystanders while the thing is being done, are original and not hearsay evidence, because they are part of the *res gestæ,* but a defendant may not manufacture evidence for himself, either before or after or in the moment of the assault, and claim its admission as part of the *res gestæ.* In no just sense can words spoken several moments before or after be considered a part of the thing done.

4. Under such a state of facts as shown above, an instruction to the jury that " if you have reasonable doubt growing out of the evidence as to whether or not Milton Yarberry, the defendant, inflicted mortal wounds upon Charles Campbell which caused his death, you must acquit the defendant," is properly refused by the court, as it would have put the jury upon an unnecessary inquiry and tended to confuse their minds.

5. It is not admissible, on a trial for homicide, to show a conversation between the deceased and a bartender prior to the shooting, the defendant and the deceased being strangers to each other and such conversation not being in the nature of threats, it not having been shown that the deceased had committed, attempted or threatened to commit a felony, and the conversation not having come to the ears of the defendant, Yarberry.

6. A general exception to the charge of the court to the jury will not be considered by the Supreme Court on review. The several matters excepted to must be distinctly specified.

7. Instruction to jury that the evidence showed the offense with which

Territory of New Mexico v. Yarberry.

the defendant was charged was either murder in the first degree or justifiable homicide, held not erroneous.

8. A point not made a part of the record will not be considered.

9. Newly discovered evidence that is merely cumulative will not warrant the granting of a new trial.

10. Where the indictment charges murder in the first degree, the punishment for which is fixed by law as death, a verdict that the jury "unanimously find the defendant guilty as charged in the indictment," is not objectionable for not assessing the punishment.

11. In cases of felony, the defendant must be personally present during all the proceedings and must so appear on record. But a formal averment of defendant's presence during trial is not necessary when it can be inferred from the record, from averments therein as to his being present at arraignment, his giving evidence, his presence when the verdict was rendered and at the motion for a new trial.

12. The presence of the prisoner during trial for a felony is presumed.

Appeal from the District Court for Bernalillo county.

*John H. Knaebel*, for appellant.

I. The defense was clearly entitled to prove what was said by the deceased, shortly before the homicide, in the presence of the witness Greenleaf ; and the objection to the said statement, namely, that it was incompetent and irrelevant, ought not to have been sustained.

1. If the course of examination was objectionable on any other ground, the failure to specify such other ground amounts to a waiver of further objection, and the prosecution can now insist only on the ground actually specified : *Marston v. Gold*, 69 N. Y., 220–228.

2. The prosecution objected prematurely, and having, in making the objection, assumed that the suppressed statement would, if permitted to be proved, disclose incompetency and irrelevancy, such objection was bad, unless such statement could not in any view be competent or relevant.

3. The prisoner was entitled to the benefit of the statement, if anything at the interview in question could possibly have been said by the deceased that would have been competent, relevant and material evidence for the defense.

4. The prisoner was not bound to ask leading questions, or, in the absence of any inquiry from the court, to make any statement or offer respecting what he intended to prove by the witness.

5. Every intendment is against the prosecution for suppressing the testimony, and in favor of the importance of the latter. See *Stokes v. People*, 53 N. Y., 183.

6. Therefore the appellant is now entitled to claim that, if the statement of the deceased had been allowed in evidence, it would have established animosity on his part against the appellant, and the utterance by the deceased, shortly before the homicide, of threats against the appellant.

7. Such proof would have been material, and possibly controlling in the appellant's favor, when taken in connection with the other circumstances of the killing, as presented in the appellant's evidence.

It would have tended directly and effectually to the corroboration of the appellant's account of the occurrence: *Stokes v. People*, 53 N. Y., 164, 175 ; *People v. Arnold*, 15 Cal., 476 ; *People v. Scroggins*, 37 Cal., 676 ; *Wiggins v. People*, 93 U. S., 465 ; *Davidson v. People*, 4 Col., 145.

II. The defense was also entitled to prove, as part of the *res gestæ*, first, by the witness Ronan, what appellant said, after the "first shot" was fired, and immediately preceding the tragedy ; and, secondly, by the witness Annijo, what the appellant said to the sheriff who arrested him, in response to a question of the latter, four or five minutes after the tragedy.

1. It must always be borne in mind that the appellant was an officer of the law (a constable), charged with the duty of arresting the deceased for the latter's infraction of the law against carrying and using deadly weapons: Prince's Laws, 314, secs. 9, 13 ; see, also, *Id.*, p. 258, secs. 4, 5 ; and for malicious and disorderly conduct : *Id.*, p. 259, sec. 5, chap. 3 ; and that, in this view, the *res gestæ* commenced, as soon

.as, by the information and pursuit, the appellant was brought into official relation with the deceased, pursuing and attempting to arrest the latter on complaint made, no warrant or display of official badge or authority being necessary: Prince's Laws, 314, sec. 9; *Caufort v. People*, 5 Ill., 404, *Head v. State*, 44 Miss., 731; *McKee v. People*, 36 N. Y., 113; *Commonwealth v. McPike*, 3 Cush., 181, 1 St. Ev., sec. 108, and note; Opinion, Thatcher, J., 9 Cush., 36.

III. The newly discovered evidence upon which the motion for a new trial was in part based, was highly relevant and material, and had it been before the jury it would undoubtedly have changed the result.

1. The affidavit of Reese (the coroner) shows that the evidence was not communicated to the prisoner or his counsel before the trial, and it is evident, or highly probable, that it was not only not obtainable, but actually concealed from the prisoner and his counsel, by unscrupulous accusers.

2. Such evidence would have strongly corroborated the prisoner's account of the affray, and have tended to prove him either guiltless, or answerable only for a less offense.

3. It would also have contradicted some of the most important testimony of the prosecution—that which tended to show the deceased to have been a harmless, unarmed man, wickedly set upon by a malicious murderer—and would have afforded a basis for the effective employment against such testimony of the maxim *falsus in uno, falsus in omnibus.*

IV. There being no proof of a conspiracy or common purpose existing between the appellant and his companion, the court erred in refusing to charge the fifth instruction requested.

V. The judge's charge amounts to a "comment on the weight of evidence." See *Stokes v. People*, 53 N. Y., 182.

VI. The judge was required to charge "the law of the case"—that is to say, comprehensively and fully, not in part only, nor upon a particular theory of guilt. He failed in his

charge to comply with this duty, so interpreted: Prince's Laws, 126, § 23; and see *Stokes v. People*, 53 N. Y., 182.

VII. The "Crimes' Act of 1790" (1 St. 112, § 3; U. S. R. S., § 5339), is in force in New Mexico as a "district of country" within its terms; and therefore the indictment ought to have been in the name of the United States for violation of the United States law of murder, instead of in the name of the territory for violation of the territorial law; the grand jury had no jurisdiction to find the indictment; and the court below had no jurisdiction of the person of the accused or of the offense charged against him.

1. New Mexico is a "district of country." Compare the terms "district" and "district of country" in various statutes and legal opinions: U. S. R. S., § 5339, etc.; Const., art. 1, § 8, sub. 7, 17; McLean, J., in *Scott v. Sandford*, 19 How., 541, 543; 1 St., 51, note; also *Id.*, 29, 73, 94, 98, 99, 101, 106, 123, 130, 189; *United States v. Terrel*, Hemp. C. C., note.

2. The statute should be construed according to its terms: *Tynan v. Walker*, 35 Cal., 642. *Franklin v. United States*, 1 Col., 34, to the contrary, is a bad precedent.

3. The northwestern territory was probably not within the act: Construction, 98, note. Nor the lands claimed by the Indian tribes: Wheaton Int. Law, 69, 70; 3 Kent Com., 382, 383, etc.; *Worcester v. State of Georgia*, 6 Pet., 515; *sed vide United States v. Rogers*, 4 How., 572.

4. Notwithstanding the general rule as to the continuing force of foreign laws in territory acquired, not by discovery: 1 Bl. Com., 107; 1 Kent Com., 343, 473; 1 Story Cons., §§ 147, 148; *Town of Pawlet v. Clark*, 9 Cranch, 333; *Bogardus v. Trinity Church*, 4 Paige, 178, 198; *Canal Appraisers v. The People*, 17 Wend., 584, 622; *Van Renselaer v. Hays*, 19 N. Y., 93; also, 1 Kent Com., 473, note; but by conquest or peaceable cession: Authorities *supra;* *American Ins. Co. v. Cauter*, 1 Pet., 542, 543; *United*

*States v. Perchman,* 7 Pet., 87; *Mitchel v. United States,* 7
Pet., 87; *Leitensderfer v. Webb,* 20 How., 177, 178; 17
Wend., *ubi supra,* also, 585, 586, 587, 588; the Crimes Act
ought to be held to extend over New Mexico, *ex proprio
vigore:* 1 Bl. Com., 108; *Scott v. Sandford,* 19 How., 393;
also, the second clause of Article VI. of the Constitution;
*United States v. Seveloff,* 2 Sawyer, 311; *Cross v. Harrison,*
16 How., 78; *United States v. Hudson,* 7 Cranch, 32; 1 St.,
930, art. 9; 15 St., 542, art. 3; Bowyer Universal Public
Law, 160, 327, 365.

5. That act has by various enactments been extended over
all, or nearly all, newly acquired territory, in pursuance of a
cautious legislative policy: 4 St., 729, § 25 (and previous
Indian country acts); 2 St., 383, § 7; 2 St., 743, §§ 4, 16; 3
St., 654, § 9; also, District of Columbia Act (U. S. Laws,
1871). See *United States v. Guiteau,* not reported; see,
also, various territorial acts.

6. The 17th section of the organic act declares such ex-
tension in New Mexico; that section being equivalent to a
declaration that the general laws should extend to and have
full force and effect in this territory. Compare similar
clauses in various acts admitting states and organizing terri-
tories.

The indictment is fatally defective, because it is drawn in
the name of the territory, for violation of the territorial law,
instead of in the name of the United States, for violation of
the act of congress, relating to the crime of murder.

The Crimes Act of 1790 (1 St., 113, § 3), provides "that
if any person or persons shall, within any fort, arsenal, dock-
yard, magazine, or in any other place or district of country,
under the sole and exclusive jurisdiction of the United States,
commit the crime of willful murder, such person or persons
on being convicted thereof shall suffer death."

Substantially the same provision is embodied in the United
States Revised Statutes, under the general head of " Maritime

and Territorial Jurisdiction of the United States:" United States Revised Statutes, sec. 5339.

Although the necessity of exercising the constitutional prerogative of legislation over places ceded (a large part of New Mexico was ceded to the Union by the state of Texas—*vide* Organic Act, 981, 446), or to be ceded to the Union by the state, for military, naval and governmental purposes : Const., art. 1, sec. 8, subd. 17, may have prompted the enactment of certain provisions of the Crimes Act ; yet it is evident that the act, taken in its whole scope and purpose, was intended as an assertion of the sovereignty of the Union, for the protection of its citizens throughout the national jurisdiction, against the more aggravated forms of lawlessness, by which their lives or property might be imperilled.

On the adoption of the constitution, the United States became a nation, with the rights and duties of exclusive sovereignty within a constitutionally limited jurisdiction, whose territorial extent was susceptible of indefinite extension by means of cessions from the several states and of foreign acquisition.

Although the political duty of protecting the citizens was constitutionally imposed on the nation, and the nation was vested with the correspondent power to declare and punish crimes, yet, until action under this power, there could be no practical protection to the citizens against criminal offenders; for the constitution did not adopt the common law code of crimes, but left to congress the establishment of all criminal laws: 1 Kent Com., 331; *United States v. Hudson*, 7 Cranch, 32.

The first crime which received the attention of congress was treason, which threatens the nation's life ; the next crime was murder, which threatens the life of the citizen : 1 St. 112, sec. 1, 2, 3. And, as in the former case, the first Crimes Act defined treason and provided for its punishment, commensurately with the existing political necessity, and

hence so as to comprehend the offense whenever committed within the national jurisdiction, so, in the latter case, the same act declared the crime of murder and provided for its punishment whenever the crime should take place upon territory under "the sole and exclusive jurisdiction of the United States."

The political duty to provide for the punishment of the high crime of murder, when committed within the exclusive jurisdiction of the United States, was self-evident at the time of the enactment of the Crimes Act; the words of the act are so comprehensive as to imply that the act was passed in recognition of this duty and for its full discharge; and it would stultify the national legislature, and entail public disaster, so narrowly to construe its provisions as to cramp and obstruct its operation and energy.

If the statute was needed to supply a political want, and a literal construction of the statute will fully supply that want, it is the part of the courts to give to the words employed their plain and natural meaning, and not to seek by technical subtlety to defeat the legislative intent.

The purpose of the section under discussion was to declare that murder, which, by the law of nature, is a high crime, but which for artificial reasons could not be punished within the exclusive jurisdiction of the United States, without a statutory provision, is, in the estimation of this nation, a crime deserving of death, and amenable to that punishment whenever committed within its exclusive jurisdiction.

It has been suggested that the specification in the statute in question of "fort, arsenal, dock-yard, magazine," ought, under the rule of *ejusdem generis*, to control the succeeding words, "any other place or district of country," so as to restrain the application of the latter to cases of establishments similar to those specifically enumerated.

But the rule of *ejusdem generis* is much misunderstood. Fairly stated, it is the rule which requires that when in any

statute there is a specific enumeration of things to which it applies, followed by a general word evidently intended to include all other things of similar nature, and when the statute does not in its origin or purpose contain or imply reason for a more liberal construction, the general word shall be deemed limited in signification to things of the general nature of those actually specified.   There are, however, two reasons why this technical rule is not applied.

1st. So narrow a construction would violate the intent of the law, which was to provide for all cases of murder occurring upon territory "under the sole and exclusive jurisdiction of the United States."

"It is a universal principle of construction that courts must find the intent of the legislature in the statute itself.   Unless some ground can be found in the statute for restraining or enlarging the meaning of its general words, they must receive a general construction, and the courts cannot arbitrarily subtract from or add to it:" *Tynan v. Walker*, 35 Cal., 642, citing *Beckford v. Wade*, 17 Vesey, Jr., 87.

To illustrate the proposition that the technical rule must yield to the real intent otherwise gathered, I cite the second clause of the second section of the fourth article of the constitution, which provides for the recaption of fugitives from justice.   Such a fugitive is referred to as "a person charged in any State with treason, felony or other crime," yet, the general word "crime" is not judicially construed as signifying only crimes *ejusdem generis* with "treason," and "felony," but as meaning literally all crimes, even inclusive of merely statutory offenses:  *In re Fetter,*, 3 Zabriskie, 311; *In re Clark*, 9 Wend., 212; *In re Haywood*, 1 Sand., S. C., 701; *Johnston v. Riley*, 13 Geo., 97; see also *Regina v. Edmundson*, 2 E. & E., 75.

2d. Both the word "place" and the term "district of country" were employed, not as indefinite expressions for whose interpretation a resort might he had to the previous

specific words, but rather as definite certain expressions limited in signification by the succeeding words, "under the sole and exclusive jurisdiction of the United States." While certain establishments were referred to specifically in order to make it plain that congress intended to include all the military and naval places specified in the constitution (*ubi supra*), yet a broader phraseology was used, for the purpose of extending the enactment to all places within the exclusive jurisdiction of the United States. Although according to the views here maintained the words "any other place" might fairly be construed as bringing within the operation of the statute all places over which congress had the right of exclusive legislation, yet, the framers of the statute, having apparently in view the possible application of the rule of *ejusdem generis*, in restriction of the ordinary meaning of the word "place," and desiring to avoid the possibility of such abortive construction, added the words "district of country," in order to make the legislative intent absolutely clear; for, whatever plausibility there is in the suggestion that a general word, following specific words, and having a signification suggestive of a genus to which all the specific words appropriately belong as species, ought to be limited in its application to subjects analogous to those intended by the specific words, such plausibility does not attach to a distinct term or phrase introduced in the same sentence, after and in addition to such general word (*e. g.* after the word "place") and not appropriate as a general term to cover the specific words previously enumerated. On the contrary, the use of such independent phrase indicates a new subject, and makes it manifest that the legislative mind in framing the statute passed from the subject-matter previously considered to the consideration of a new and different subject.

No one would think of characterizing either "fort," "arsenal," "dock-yard," or "magazine," as a "district of coun-

try," although each of such establishments might be properly characterizd as a " place."

Indeed, the very authorities which may be cited as tending to show that the narrow rule of construction in question applies, admit that congress intended by the act to provide, not only for forts, arsenals, dock-yards, magazines, and like places, but also for the " District of Columbia," then in contemplation, although not a " place" *ejusdem generis* with " fort," etc. ; and that the words " district of country " were employed so as to comprehend the new district.

This admission of course destroys all the force of the sug· gestion that the restrictive rule applies. And, inasmuch as the words   district of country," qualified in meaning by the preceding adjectives " any other," are not limited to any particular district, but are used with reference to any " district of country " within " the sole and exclusive jurisdiction of the United States," we must hold the same to include what· ever national territory can fairly come within the term in its ordinary sense. The statute says, " *any* other place or *district of country.*" It employs a term signifying any unorganized extent of country. So far from intending simply the contemplated " District of Columbia," it avoids the use of any limiting term and adopts language emphatically general. The constitution, in providing for the seat of government, does not refer to a " district of country," but simply to a " district not exceeding ten miles square," and it implies a much more limited area than the general term " district," or the term ' district of country," as used in the statute. " District " is a very large and comprehensive term. It is used in ordinary conversation, in military orders, in municipal laws, and in geographical description, to designate large tracts of country over which civil or military authority is exercised. Thus we have judicial districts, revenue districts, military districts, and police districts. We have the " District of Columbia."

Justice McLean, in *Scott v. Sanford*, 19 How., 541, says : " The word 'territory,' according to Worcester, means 'land, country, a district of country under a temporary government.' The words, 'territory or other property,' as used, do imply from the use of the pronoun ' other,' that territory was used as descriptive of land ; but does it follow that it was not used also as descriptive of a district of country ? In both of these senses it belonged to the United States—as land, for the purpose of sale ; as territory for the purpose of government."

Again, on page 543 :

" The sovereignty of the federal government extends to the entire limits of our territory. Should any foreign power invade our jurisdiction, it would be repelled. There is a law of congress to punish our citizens for crimes committed in districts of country where there is no organized government. Criminals are brought to certain territories or states designated in the law for punishment. Death has been inflicted in Arkansas and in Missouri, on individuals, for murders committed beyond the limits of any organized territory or state ; and no one doubts that such a jurisdiction was rightfully exercised."

Justice Curtis says in the same case, at page 598 :

" Dr. Emerson was an officer in the army of the United States. He went into the territory to discharge his duty to the United States. The place was out of the jurisdiction of any particular state, and within the exclusive jurisdiction of the United States."

The ordinance of 1787 declared the northwestern territory to be " one district :" 1 St., 51, note.

Several statutes passed before the Crimes Act provide for revenue districts (1 St., 29), and judicial districts (1 St., 73), or otherwise refer to " districts " (1 St., 94, 98, 99, 101, 106), and many later statutes refer to United States territory as " districts :" 1 St., 123, 130, 189. In describing territory, and

Territory of New Mexico v. Yarberry.

especially unorganized territory of the United States, we very naturally refer to it as " a district of country."

The statute is a general statute enacted for the protection of the citizen, not only within the military and naval establishments, and districts of country, then possessed by the United States, but also within such as it might possess at any future time, and, although nearly a century has passed since the passage of the statute, it has proved adequate during all that period, for the prevention and punishment of murder within all places which have come under the sole and exclusive jurisdiction of the United States.

It is in no sense a local act, but it operates as an adequate and abiding provision in the national criminal code, defining and punishing the crime of homicide throughout the national jurisdiction; of equal dignity with the principles of the common law, under which murder was for centuries recognized and punished as a crime. Indeed the statute effected a transfer of the common law of murder to the national jurisdiction.

It is to be observed that only such murders were provided for as should occur within "the sole and exclusive jurisdiction of the United States."

It is doubtful whether, in view of the ordinance of 1787, and the contractual and fiduciary nature of its provisions, the legislators of that day would have been disposed to regard the northwestern territory as a district of country under the "sole" and exclusive jurisdiction of the United States. But the question has never judicially arisen.

The ordinance, adopted in 1787, and continued in force under the constitution by the act of 1789 (1 St., 50), contained special provisions respecting crimes, under which the territorial council, composed of the governor and judges, was required to select for the northwestern territory and there put in force such criminal laws of the original states as it might deem necessary: 1 St., 51.

It is well known that at that time murder was punished

capitally in every state, and it might well be that, knowing the state laws on the subject to be either the common law, or statutes substantially declaratory thereof, thus conforming to the intent and spirit of the act of 1790, congress did not intend by that act to supplant the territorial legislative power previously conferred. Besides, there is a well settled rule of law, under which the special provisions of the ordinance would be held not repealed by a subsequent general act not necessarily involving repugnancy to those provisions: Sedgwick on Construction, 98, note (2d ed.), and cases cited. Again, in the application of the statute to territory occupied by Indian tribes, under claim of sovereignty, it might well be doubted whether such Indian country could be properly considered as under the "sole and exclusive jurisdiction of the United States." The status of such tribes has been considered by high authority. "The political relation of the Indian nations on this continent towards the United States is that of semi-sovereign states, under the exclusive protectorate of another power:" Wheaton's Int. Law, 68. "The United States Supreme Court held that the Cherokees constituted a distinct political society capable of managing its own affairs and governing itself, and that they had uniformly been treated as such since the first settlement of the country. The numerous treaties made with them by the United States recognize them as a people capable of maintaining the relations of peace and war and responsible in their political capacity. * * They were a domestic dependent nation:" Wheaton's Int. Law, 69; *The Cherokee Nation v. The State of Georgia*, 5 Pet., 1. "The British crown considered them as nations competent to maintain the relations of peace and war and of governing themselves under its protection. The United States, who succeeded to the rights of the British crown, in respect to the Indians, did the same, and no more; and the protection stipulated to be afforded to the Indians, and claimed by them, was understood by all parties as only

binding the Indians to the United States as dependent allies. A weak power does not surrender its independence and right to self government by associating with a stronger and taking its protection. This was the settled doctrine of the law of nations, and the Supreme Court, therefore, concluded and adjudged that the Cherokee nation was a distinct community, occupying its own territory in the boundaries accurately described, within which the laws of Georgia could not rightfully have any force, and into which the citizens of that state had no right to enter but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of congress :" Wheaton's Int. Law, 69, 70; 3 Kent Com., 382, 383, etc.; *Worcester v. State of Georgia,* 6 Pet., 515. Although later decisions of the Supreme Court indicate a tendency to abridge the claims of the Indian tribes to legal recognition as *quasi* sovereign (*United States v. Rogers,* 4 How., 572); yet the prevailing opinion at the time of the passage of the Crimes Act of 1790, and for a long time subsequently, must have been that the country occupied by Indian tribes under claim of sovereignty, was not under the "sole and exclusive jurisdiction of the United States." Of course, at that time the relation of vagabond tribes to the national government had not been considered.

It may well be that, in view of this question regarding the *quasi* sovereignty of Indian tribes, even the express extension of the Crimes Act to the Louisiana purchase (2 St., 283, § 7; *Id.* 331; *Id.* 322) did not make it judicially clear that the vast tracts claimed and occupied by Indian tribes were intended to be affected by the extension. Whatever the motive, whether that here suggested, or whether the precaution which induced so much other cumulative and supererogatory legislation, congress deemed it prudent, in the statutes defining and regulating the "Indian country" (3 St., 383; 4 St., 733, § 25), to extend the general criminal acts over the districts of country comprehended within the term ;

and it is possible that this express extension was deemed the more necessary, because certain parts of the " Indian country " were within state boundaries, and presented complicated questions of jurisdiction : 6 Pet., 515, *supra*.

On this subject of the Indian country, I refer to the opinion of Judge Wells, formerly district judge of Missouri, reported 1 Western Law Journal, p. 246 ; also Hempstead C. C., p. 413, note, who, criticising the opinion of Judge Catron, cited by him, says : Judge Catron, in his opinion, says, " In the case supposed of the commission of murder or robbery on the water in the Indian country, it would be a capital felony committed in a place and district of country under the sole and exclusive jurisdiction of the United States, and be punishable by the eighth section of the act of 1790." Now, I deny that the Indian country, even technically, either land or water, is under the sole and exclusive jurisdiction of the United States. The United States have not, in any instance within my knowledge, exercised such sole and exclusive jurisdiction. By the acts of 1817 and 1834, above referred to, nothing of the kind is attempted. They both expressly except crimes committed by Indian on Indian, and confine their operations to regulating trade and commerce, and preserving peace. A sole and exclusive jurisdiction would exclude all Indian laws and regulations, punish crimes committed by Indian on Indian, and regulate and govern property and contracts, and the civil and political relations of the inhabitants, Indians and others, in that country. It would be wholly opposed to a self-government by any Indian tribe or nation. This self-government is expressly recognized and secured by several treaties between the United States and Indian tribes in the Indian country attached by the act of 1834 to Arkansas and Missouri districts for certain purposes. This may be seen from the treaty with the Choctaws in 1830, and the treaty with the Creeks in 1832, and other Indian treaties.

" The United States could not, therefore, assume a sole and

exclusive jurisdiction over the Indian country without violating their treaties, which treaties are the supreme law of the land.

" I conclude, therefore, that the Indian country is, neither in fact nor in law, under the sole and exclusive jurisdiction of the United States.

" Indeed if congress considered the Indian country as being under the sole and exclusive jurisdiction of the United States, it was wholly unnecessary to extend to that country the laws for the punishment of crimes committed in places under the sole and exclusive jurisdiction of the United States."

In this proposition last above cited, Judge Wells admits that the Crimes Act extends *ex proprio vigore* to all new territory which comes under the sole and exclusive jurisdiction of the United States.

Nevertheless, there is some obscurity among juridical writers of the highest repute respecting this self-extending force of general laws over newly-acquired territory.

While it is generally admitted that new territory acquired by right of discovery is to be governed by the existing laws of the sovereignty to which it becomes thus attached, so far as the same are reasonably applicable, and, on this principle, it is generally held that the American colonists brought with them such laws of their ancestors as were adapted to colonial life: 1 Bl. Com, 107; 1 Kent Com., 343, 473 ; 1 Story Const., §§ 147, 148; *Town of Pawlet v. Clark*, 9 Cranch, 333; *Bogardus v. Trinity Church*, 4 Paige, 178, 198; *Canal Appraisers v. The People*, 17 Wend., 584, 622 ; *Van Rensselaer v. Hays*, 19 N. Y., 73 ; also 1 Kent. Com., 473, note.

Yet even this proposition is " full of vagueness and perplexity," owing to the difficulty of determining the question of applicability : 1 Story Const., § 149.

Even greater difficulty is encountered in the case of coun-

tries acquired by arms or ceded by treaty, wherein a body of laws more or less enlightened is found in actual operation.

There is authority for the proposition that during belligerent occupation, and before definitive conquest, the ordinary municipal laws of the occupied country remain in force: Per Field, J., in *Coleman v. Tennessee*, 97 U. S., 517. And after acknowledged conquest, or peaceable cession, it is generally held that the old municipal laws of the acquired territory continue in force until changed by the expressed will of the new sovereign : Authorities *supra ; American Ins. Co. v. Canter*, 1 Pet., 542, 543 ; *United States v. Percheman*, 7 Pet., 87 ; *Mitchel v. United States*, 9 Pet., 734; *Leitensdorfer v. Webb*, 20 How., 177, 178 ; 17 Wend., *ubi supra*, also pp. 585, 586, 587, 588.

Nevertheless, this proposition, respecting the continuing force of the old laws of acquired territory, is subject to the qualification that the old laws can continue only so far as is consistent with the constitution, policy and moral code of the new sovereign : 1 Bl. Com., 108 ; *Scott v. Sandford*, 19 How., 393 ; also the second clause of Article VI of the Constitution.

It is also subject to the qualification that they may be abolished and supplanted, not merely by the action of the legislative department of the new sovereignty, but in default of such legislative interference, by the mere will of the executive department. Such exercise of executive authority was usual in the government of the dependencies of the English crown : *Canal Appraisers v. The People*, 17 Wend., 585, 586.

And even in our own history, California and New Mexico afford examples of Mexican laws changed and supplanted under American executive authority by military and provisional governors; and certain provisional laws thus promulgated have received the sanction of the Supreme Court of the United States and have by that tribunal been held not only

to operate as effectual repeals of the old laws but also to continue in force after the cessation of military or provisional government: *Cross v. Harrison*, 16 How., 78; *Leitensdorfer v. Webb*, 20 How., 177, 178.

Such decisions, however, refer only to the laws concerning the relations between individuals, and other subjects of the ordinary municipal code; but they do not extend to cases provided for by the constitution or general statutes, which in their nature operate throughout the nation.

I submit that in a country like our own, existing under a written constitution, which recognizes no common law crimes, except such as congress provides for by statute (7 Cranch, 32, *supra*), the general doctrine, above alluded to, ought to be subjected to the further qualification that, except during belligerent occupation and prior to a consummated acquisition of territory, not only the constitution, with the bill of rights, but also all general statutes intended to assert the sovereignty of the nation over its entire domain, should be deemed in full force over all acquired districts, and be held to supplant all repugnant prior laws whether ancient or provisional.

In the sixth article of the constitution, it is expressly provided that "This constitution and the laws of the United States, which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

This provision covers not only the law of murder, in question here, but the laws for the prevention of mail robberies and other crimes enumerated in the Crimes Acts of 1790 (1 St., 112) and 1825 (4 St., 115).

Within the spirit of this constitutional provision, it ought to be held that the moment that new territory is acquired and accepted by both the executive and legislative departments

of the government as part of the national domain and jurisdiction, all foreign and provisional laws and regulations that previously operated on subjects upon which the constitution and general laws of the Union are intended to operate, should be deemed merged· in the latter, in order that the latter should carry equal dignity and force into every part of the national jurisdiction. Such is the principle declared in *Scott v. Sandford*, 19 How., 393. Such is the intent of the treaties with Mexico ceding California and New Mexico (9 St., 930, art. 9), and with Russia ceding Alaska (15 St., 542, art. 3).

It is necessary to beware of false analogies sometimes suggested between our institutions and those of England.

" In the distribution of political power between the great departments of government, there is such a wide difference between the power conferred on the president of the United States and the authority and sovereignty which belong to the British crown that it would be altogether unsafe to reason from any supposed resemblance between them, either as regards conquest in war, or any other subject where the rights and powers of the executive arm of the government are brought into question. Our own constitution and form of government must be our only guide :" *Fleming v. Page*, 9 How., 618.

In the opinion of the Supreme Court of the United States in the case of *Cross v. Harrison*, 16 How., 198, it is said that " the ratifications of the treaty made California a part of the United States, and that as soon as it became so, the territory became subject to the acts which were in force to regulate foreign commerce with the United States, after those had ceased which had been instituted for its regulation as a belligerent right." * * * *

" In this case foreign trade had been changed in virtue of a belligerent right before the territory was ceded as a conquest, and after that had been done by a treaty of peace, the

inhabitants were not remitted to those regulations of trade under which it was carried on whilst they were under Mexican rule ; because they had passed from that sovereignty to another whose privilege it was to permit the existing regulations of trade to continue, and by which only they could be changed.

"We have said in a previous part of this opinion that the sovereignty of a nation regulated trade with foreign nations, and that none could be carried on except as the sovereignty permits it to be done."

The court quotes, with apparent approval, from a despatch of Secretary Buchanan (*Ib.*, p. 184), who says with reference to the political condition of California after the treaty of peace : "The termination of the war left an existing government, a government *de facto*, in full operation, and this will continue with the presumed consent of the people, until congress shall provide for them a territorial government. The great law of necessity justifies this conclusion. The consent of the people is irresistibly inferred from the fact that no civilized community could possibly desire to abrogate an existing government, when the alternative presented would be to place themselves in a state of anarchy beyond the protection of all laws, and reduce them to the unhappy necessity of submitting to the dominion of the strongest.

"This government *de facto* will, of course, exercise no power inconsistent with the provisions of the constitution of the United States, which is the supreme law of the land.

"For this reason no import duty can be levied in California on articles the growth, produce, or manufacture of the United States, as no such duties can be imposed in any other part of our Union on the productions of California; nor can new duties be charged in California upon such foreign productions as have already paid duties in any of our ports of entry, for the obvious reason that California is within the territory of the United States."

Equality under the constitution and general laws is suggested not only by the genius of the American government, but by political philosophy: *Vide* Bowyer on Universal Public Law, pp. 160, 327, 365.

Theoretically, even colonies participate in the legal privileges enjoyed in the mother country.

" When a nation takes possession of a distant country and settles a colony there, that country, though separated from the principal establishment or mother country, naturally becomes a part of the state, equally with its ancient possessions. Whenever, therefore, the political laws or treaties make no distinction between them, everything said of the territory of a nation must also extend to its colonies :" Bowyer *supra*, p. 365, citing *Vattel*, book 1, ch. 18.

The " Kearney Code," under which New Mexico was provisionally governed, was promulgated by General Kearney, September 22, 1846.

Under the head of " Crimes and Punishments," it provides as follows :

" SECTION I. The crimes mentioned in the first article of this law being defined with sufficient accuracy by the laws heretofore in force in this territory, it is deemed unnecessary to do more than to annex the punishments to the respective offenses.

" ARTICLE I.

" SECTION I. If any person shall be convicted of the crime of willful murder, such person shall suffer death. If any person or persons shall be convicted of manslaughter, such person or persons shall be imprisoned not exceeding five years, and fined not exceeding one thousand dollars."

The provisional organic law promulgated by General Kearney on the same day (September 22, 1846), provided (Art. 3), for a territorial legislative assembly ; the treaty of peace was signed February 2, 1848 : 9 St., 942. The present organic law was approved September 9, 1850 : 9, St., 446.

Yet no interference with the above cited provisions of the Kearney Code respecting homicide was attempted by the territorial legislature, either provisional or permanent, except the act of July 14, 1851, adopting the Kearney Code (Prince's Laws, 373) until February 15, 1854, when the legislative assembly assumed to reform the law of homicide: Prince's Laws, 256.

Thus it will be observed that the prosecution in this case is forced to the absurdity of claiming that, after the cessation of military occupation, and during the whole period from September 9, 1850, to February 15, 1854, in face of the definite and adequate provisions of the Crimes Act of 1790, the courts of this territory were obliged to consult the Mexican law for the definition of the crime of murder committed on American territory.

The law of homicide adopted and declared by the Kearney Code was in fact a merely provisi..nal regulation established for a present emergency by a temporary military commander. Why, then, should not such provisional regulation or expedient yield, upon the cessation of military rule, to the superior dignity and efficacy of a national law of general nature upon the same subject, expressive of the will of congress and intended to apply to every part of the national jurisdiction?

A similar question may some day arise respecting the immense territory of Alaska. No civil government has yet been provided for that district of country. No express statute has extended over it the Crimes Act of 1790.

It is not a part of the "Indian country" defined by the act of 1834: 4 St., 729; *United States v. Seveloff*, 2 Sawyer, (U. S. C. C.), 311.

Yet, is it therefore a land of immunity and refuge for murderers? If not, is the United States compelled to search the statutes of Russia for the law under which to punish such a crime?

I suggest that the only egress from the dilemma is found in the adoption of the wholesome rule that laws of a general nature, like the Crimes Act, extend *ex proprio vigore* to newly acquired territory.

This suggestion is confirmed by the consideration that our territorial acquisitions are immediately annexed to the national domain as part of our common country, entitled equally with the rest of the country to all the privileges guaranteed by the constitution and to an equal standing under the laws, and are not mere dependencies, like British provinces, nor of the nature of mere colonies : *Scott v. Sandford*, 19 How., 393.

There is a marked distinction between the condition of new territory acquired by the kingdom of Great Britain and that of new territory acquired by the United States : *Fleming v. Page*, 9 How., 618.

In the former case, the new territory is a mere dependency, largely under the king's control, and not entitled to all the privileges of the British constitution or of the general acts of parliament : 1 Bl. Com., 108, and context.

In the latter case, the new territory is incorporated into the Union as a constituent part thereof, under the same constitutional privileges and under the protection of the same general laws as those enjoyed by the nation at large : *Scott v. Sandford*, 19 How., 393.

This is illustrated by the fact that, although, according to the common law, acts of parliament did not extend to Ireland, the Isle of Man, the American colonies, and other dependencies, unless the latter were expressly named therein (1 Bl. Com., 101, *et seq.*), yet in the United States general acts of congress operate throughout the Union, inclusive of all outlying territory.

But whether or not the Crimes Act extended *ex proprio vigore* to the territory of New Mexico upon its consummated acquisition under the treaty of peace, it is plain that

the 17th section of the present organic act declares such extension : 9 St., 446.

That section provides : " That the constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within the said territory of New Mexico as elsewhere within the United States.

It has for many years been the policy of congress, in providing for the government of newly organized districts of country, to make express declaration of its intent to extend over such territory the criminal and other general laws of the Union; abundant caution inducing such legislative declaration even in cases where there can be no possibility of doubt that the laws would extend themselves without legislative aid.

On this subject Judge Deady remarks ( *U. S. v. Seveloff*, 2 Sawyer C. C., 318): " It has been so common a habit of congress upon the acquisition of territory to specially extend the laws of the United States over it, that an impression seems to prevail that, without such action, these laws would not affect territory acquired after their passage. For my own part, I can see no good reason why any general law of the United States does not become in force at once in any country acquired by it without reference to the time of its passage."

In pursuance of this cautious congressional policy—the very adoption of which discloses the jealousy of the government respecting its constitutional authority—the general laws of the United States, including the Crimes Act of 1790, were expressly extended to the territories of Orleans (2 St., 283, § 7), Louisiana (2 St., 283, § 7), Missouri (2 St., 743, §§ 4, 16), and Florida (3 St., 654, § 9), and to the Indian country (3 St., 383; 4 St., 729), and provisions similar to the 17th section of our organic act were incorporated in the organic acts of other territories, carved out of the French and Mexican cessions: (*e. g.*), Utah, 9 St., 453, § 17; Kansas, 10 St.,

277, § 32; Nebraska, 10 St., 277, § 14; Colorado, 12 St., 172, § 16; Nevada, 12 St., 209, § 16; Dakota, 12 St., 239, § 16; Idaho, 12 St., 808, § 13; Montana, 13 St., 85, § 13; Wyoming, 16 St., 183, § 16; also see U. S. R. S., § 1891, as well as in the acts under which many of the states have been admitted into the Union (*vide infra*).

Pursuant to the same policy, many of the territorial organic acts contain wholly unnecessary precautionary provisions forbidding encroachments by territorial legislatures on the congressional prerogative and reserving certain powers of supervision and repeal to congress, and these provisions are retained in codified form in the United States Revised Statutes: §§ 1839, 1840, 1851.

In view of the sovereignty of the Union over the territories, the supererogatory nature of such legislation respecting the territories is obvious: *National Bank v. County of Yankton*, 101 U. S., 129.

And it seems equally clear that, in view of the equality of the several states under the constitution, the statutory extension of general laws to new states is also supererogatory: Const., art. 6, second clause; *Id.*, art. 4., § 2; *U. S. v. McBratney*, 104 U. S., 621.

The plain intent of the 17th section of the organic act is to declare the constitution and general statutes of the United States to be of like dignity, force and effect in the territory of New Mexico as elsewhere in the United States—in other words, to insure the full operation in this territory of the constitution and general laws in every case in which they can be applied. In face of this intent, any merely grammatical quibbling tending to restrict the scope and effect of the provision is petty and puerile.

The various statutes purporting to extend the general laws of the United States to newly organized territories or states are all *in pari materia*, inspired by the same intent, and effective of the same object, although clothed in variant

27

phraseology—many being in form identical with the 17th section in question : 10 St., 277, §§ 14, 32 ; 12 St., 172, § 16, and other citations *supra;* others declaring that the general laws shall " extend," and shall have " full force and effect :" 3 St., 554, § 9 ; 3 St., 750, § 11 ; 2 St., 283, § 7 ; others declaring that they shall be " in force :" 4 St., 729, § 25 ; 9 St., 453, § 17 ; but all regarding the general laws as already of full force and effect elsewhere in the United States, and intending to declare them to have equal force and effect in the newly organized districts of country.

The Crimes Act of 1790 should be construed in the light of the various statutes, *in pari materia,* expressly extending it over newly organized districts of country : Orleans and Louisiana, 2 St., 283, § 7 ; Florida, 3 St., 654, § 9 ; Indian Country, 3 St., 383 ; 4 St., 729, § 25 ; District of Columbia, 16 St., 419, § 34 ; and of the judicial decisions respecting its effect in such districts ; and so construed it is plain that it is potent to reach the crime of murder whenever committed upon territory " under the sole and exclusive jurisdiction of the United States :" *United States v. Rogers,* 4 How., 567 ; *United States v. Osage Indians,* Hempstead C. C., 27 ; *United States v. Terrel, Id.,* 411, and note at page 419 ; *United States v. Scroggins, Id.,* 478 ; *United States v. Sanders, Id.,* 483 ; see also *United States v. Guiteau, infra.*

These applications of the Crimes Act amount to a legislative declaration of the signification of the terms " place " and " district of country," as used in the act ; and this construction has in the cases above cited received authoritative judicial sanction.

The section of the organic act (9 St., 446, sec. 17), declaring the laws of the United States in force in the territory, when not locally inapplicable, must be deemed to operate upon those laws as already interpreted by congress and the courts ; and, so operating, it must put the murder statute in full force as the only law of homicide in the territory.

The 25th section of the Indian country act of 1835 (4 St., 729, sec. 25), reads as follows :

" That so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States shall be in force in the Indian country :   *Provided,* That the same shall not extend to crimes committed by one Indian against the person or property of another Indian."

It is evident that this section of the Indian country act is less emphatic and explicit in its phraseology than the 17th section of our organic act ; yet in the case of *United States v. Rogers,* 4 How., 567, in which the Supreme Court of the United States considered the question whether the proviso above cited, included the case of a white man charged with murder, who had become a member of an Indian tribe, the court expressly held that " by the twenty-fifth section of the act, the prisoner is undoubtedly liable to punishment, unless he comes within the exception contained in the proviso," etc. ; thus holding that the meagre language of the section then under consideration was sufficient to extend the murder statute to the Indian country as a " place " or " district of country."

In the case of *Hornbuckle v. Toombs,* 18 Wallace, 648, a section of the Montana organic act, whose phraseology is precisely similar to that of the section of our organic act in question (13 St., 85, sec. 13), is construed as follows :

" That clause has the effect undoubtedly of importing into the territory the laws passed by congress to prevent and punish offenses against the revenue, the mail service, and other laws of a general character and universal application, but not those of a specific application " (like, for instance, the case cited by the court, of the statute authorizing the supreme court to employ a reporter).

Even more direct authority, regarding the proper construction of the phraseology in question, is found in the decision

of the appellate court of the District of Columbia in the recent case of *United States v. Guiteau*. Guiteau, the assassin of the late President Garfield, was indicted for murder under the Crimes Act of 1790 as incorporated in the United States Revised Statutes, sec. 5339.

The language of the Crimes Oct, " any other place or district of country," is certainly broad enough to include the district of Columbia as a district of country : *Vide United States v. Bevans*, 3 Wheaton, 390, 391; *Cohens v. Virginia*, 6 Wheaton, 426.

But in 1801 the laws of Maryland were extended by act of congress over the District of Columbia : 2 St., 103, sec. 1. And the counsel for Guiteau claimed before the court *in banco*, that the Maryland laws thus introduced furnished the only murder law in force in the district, and that therefore the indictment, being founded upon the provisions of the Crimes Act of 1790, was unauthorized and void.

The court in considering the question of repugnancy thus raised between the law of 1801 and the Crimes Act of 1790, alludes to the 34th section of the District of Columbia act of February 21, 1871 (16 St., 419, sec. 34), which is similar in form to the 17th section of our organic act, and proceeds :

" If any questions were raised about the incongruity of these two statutes, none certainly can be raised since the act of February 21, 1871 (16 St., 419), the thirty-fourth section of which act providing that all the laws of the United States not locally inapplicable shall have the same force and effect within the district as elsewhere in the United States. If the law of 1790 was put aside by the law of 1801, its operation was restored in 1871. The usual rule of construction as to repeals is that a special provision relating to a particular case or locality is not superseded by a general provision for all places and cases; but no such problem is presented here. Both the act of 1801 and the act of 1871 made a comprehensive provision for a whole body of laws which should be in

force here, and to the extent of its purview the later provision necessarily supersedes the earlier. We are of opinion then that section 5339 of the Revised Statutes of the United States applies to murder committed in the District of Columbia :" *Vide* Washington Post, May 23, 1882.

Judge Hallett, of Colorado, has, in the case of *Franklin v. United States*, 1 Col., 3, expressed views, respecting the territorial application of the Crimes Act, opposed to those here presented. Judge Hallett is a jurist of great ability and high reputation. Nevertheless, he sometimes fails in the construction of statutes to display that logical energy and masterly comprehension which characterize his judicial efforts in other branches of law ; and consequently we find that on several occasions his decisions regarding the force and effect of important acts of congress have, because of their restrictive tendency, been condemned by the Supreme Court of the United States and overruled.

Judge Hallett's first proposition is couched in the following language (p. 37) : " We must first inquire whether this territory is a place or district of country under the sole and exclusive jurisdiction of the United States within the meaning of the law mentioned. We may find an answer to this inquiry in the sixteenth section of the act establishing this territory (*i. e.*, Colorado Act, 12 St., 172), which declares ' that the constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within the said territory of Colorado as elsewhere within the United States. Within the several states, section 3 of the act of 1790, provides for punishing murder, where committed in a fort, arsenal, dock-yard or the like place, owned by the general government, and the above mentioned section of the organic act declares it shall have the same force and effect in this territory. It may be suggested that the words ' force and effect ' used in the organic act, refer to the penal power of the law, and were not designed to limit

its operation to places owned by the general government as in the several states. But a law is presumed to be effectual to accomplish its purposes, and therefore it was not necessary to declare what force and effect the act of 1790 should have in this territory, except for the purpose of limiting the places within which it should obtain. If, by the terms of the act, it is in force in the territory, its power is declared in the language of the act itself, and the limitation in the organic act that it shall have the same force and effect as elsewhere in the United States can refer only to the places in the territory within which it shall operate. If, then, in obedience to the sixteenth section of the organic act, we give section 3 of the act of 1790 the same force and effect in this territory which it has elsewhere in the United States, we shall apply it to murder committed in forts, arsenals and the like places belonging to the United States and in the Indian territory."

This extraordinary reasoning, respecting the office of the words "force and effect' in the application of general statutes of the United States, savors of the fantastic subtlety of a class of antiquated cases which have long since been buried by the common sense of the profession.

It implies that the provision in question was not intended to give full force and effect in the newly organized territory to the constitution and general laws, but rather to curtail and limit their operation. The provision relates equally to the constitution and to the laws, and, according to Judge Hallett, so far from evincing an intent to provide for the full application of the constitution and laws, it operates as a declaration that the "supreme law of the land" shall not be applied in the territory in conformity with its terms, but in a cramped and mitigated sense.

The "United States" is used in the section as the title of the nation and not simply to indicate the individual states, and the only purport of the provision in question is to declare the constitution and laws to be forceful and effective in the

territory, even as they are forceful and effective throughout the rest of the national domain; not to limit or cramp their operation, but, declaring them to be in operation, to leave their force and effect to be determined by their own terms and by relation to the subject matter affected.

The genesis of the provision furnishes a convincing argument in favor of the construction here claimed. Vermont was by the act of 18th February, 1791 (1 St., 191), declared to be admitted from and after 4th March, 1791, "as a new and entire member of the United States." No lawyer of that day would have denied that the mere fact of admission into the Union would extend over Vermont the constitution and general laws passed thereunder. Yet this extension of the constitution and laws over a new state, would be largely theoretical and not effectual, unless by further legislation proper local provision respecting judicial and revenue districts, courts, judges, attorneys, marshals and other officers should be made. This political need led congress, in the case of Vermont, to pass the supplemental act of 2d March, 1791 (1 St., 197), which enacts "that from and after the third day of March next all the laws of the United States which are not locally inapplicable ought to have and shall have the same force and effect within the state of Vermont as elsewhere in the United States;" "and to the end that" the judiciary act of 1789 should have due effect, provision is then made for a judicial district, etc. And in like manner provision is made for the collection of revenue, the taking of the census, etc. This is the first occasion on which a provision like that in question appears in the statutes of the United States, although in one or two previous statutes laws were applied to new districts by a declaration that they should have "force" in the latter: 1 St., 99, § 6; *Id.*, 108, cl. 8.

It is obvious that no such intent can be imputed to this original use of the provision as that imputed by Judge Hallett to the use of like provisions in the territorial organic acts.

In providing for the admission of Tennessee, congress declared (1 St., 491), " That until the next general census the said state of Tennessee shall be entitled to one representative in the house of representatives of the United States, and in all other respects as far as they may be applicable the laws of the United States shall extend to and have force in the state of Tennessee in the same manner as if that state had originally been one of the United States."

Of course this provision was constitutionally unnecessary; but I cite it to show that the central idea of the provision in question can be conveyed by the use of words not in any view susceptible of Judge Hallett's restrictive interpretation.

But this act of admission not providing Tennessee with courts, judicial or collection districts, or officers, further provisions were needed to secure the due execution of the theoretically extended laws, and hence another act was passed (1 St., 496), to supply this need, and, in pursuance of the supererogatory policy before alluded to, a cumulative provision was introduced similar to that above cited from the Vermont act (1 St., 197).

Still no legislative intent can be perceived to accomplish by the language used any other purpose than to declare the laws in full force, and to leave to their own terms the expression of the nature and extent of their operation. So, in the case of Ohio, which being admitted on an equal footing with the other states (2 St., 173), and thus made by implication subject to all applicable laws, still needed legislative provision for judicial and other official machinery, this need was supplied 19th February, 1803 (2 St., 201), by an act which, passed according to the recital " in order therefore to provide for the due execution of the laws of the United States within the said state of Ohio " first unnecessarily declares, " That all laws of the United States which are not locally inapplicable, shall have the same force and effect within the said state of Ohio as elsewhere within the United States,"

and then enacts the needed provisions establishing courts, etc. So in the admission of Louisiana and Alabama the same provision was adopted, with the addition of a clause declaring that the laws " shall be extended to the said state :" 2 St., 701, sec. 2 ; 3 St., 664 ; sec. 1. And, so on, as a rule, the same provision generally identical in form with that in our organic act, and in that of the late territory of Colorado, appears in connection with other provisions providing the official means for carrying the laws into execution : Mississippi, 3 St., 472; Illinois, 3 St., 502; Missouri, 3 St., 653 ; Arkansas, 5 St., 50 ; Michigan, 5 St., 61 ; Florida, 5. St., 788 ; Iowa, 5 St., 789 ; Wisconsin, 9 St., 57 ; California, 9 St., 521 ; Minnesota, Oregon, 11 St., 383 ; Kansas, 12 St., 126 ; Nevada, 13 St., 30 ; Nebraska, 13 St., 47 ; Colorado, 19 St., 61.

But in the cases of Kentucky (1 St., 180), and Maine (3 St., 544, *Id.* 554), there appears to have been no express statutory extension of the laws. And in the case of Texas, which was admitted by resolution on an " equal footing" (9 St., 108), it was provided (9 St., 1), by "An act to extend the laws of the United States over the state of Texas and for other purposes," that " all laws of the United States are hereby declared to extend to and over, and to have full force and effect within the state of Texas, admitted at the present session of congress into the confederacy and union of the United States."

I submit that the phraseology in the Texas act is only the fair equivalent of the more usual provisions : *Vide Smith v. Cockrill*, 6 Wallace, 758.

So, with reference to the territories, there is the same tendency to employ the usual phraseology in the provisions extending the laws, but with occasional variations, which, discarding the words " same force and effect," which have misled Judge Hallett, are still effectual to declare the extension intended.

In the case of the territories of Orleans and Louisiana

(2 St., 283, sec. 7), and Florida (3 St., 654, sec. 9), the general acts intended to be extended, are expressly named by their titles, including the Crimes Act of 1790 ; but in the case or Florida (3 St., 654, sec. 9), the specific enumeration of extended statutes is supplemented by the addition of " all other public laws of the United States which are not repugnant," etc, and in each case, the general acts referred to are declared to " extend to and have full force and effect " in the respective territories.

In the later Florida organic act (3 St., 750, sec. 11), the specific enumeration of extended statutes is discarded as unnecessary and cumbersome, and a general provision is substituted in the following form :

" That the laws of the United States relating to the revenue and its collection, subject to the modification stipulated by the fifteenth article of the treaty of the twenty-second of February, one thousand eight hundred and nineteen, in favor of Spanish vessels and their cargoes, and all other public acts of the United States, not inconsistent or repugnant to the provisions of this act, now in force, or which may hereafter be in force, shall extend to and have full force and effect in the territory aforesaid."

But, generally, the language employed is that in question here : New Mexico, 9 St., 446, sec. 17 ; Nebraska, 10 St., 277, sec. 14 ; Kansas, 10 St., 277, sec. 32 ; Colorado, 12 St., 172, sec. 16 ; Nevada, 12 St., 209, sec. 16 ; Dakota, 12 St., 239, sec. 16 ; Idaho, 12 St., 808, sec. 13 ; Montana, 13 St., 85, sec. 13 ; Wyoming, 16 St., 183.

Nevertheless, at the very session of congress, at which the organic act of New Mexico was passed (9 St., 446), and on the same day, congress, in the Utah organic act, which is substantially like our own, uses the following language, in applying the constitution and general laws (9 St., 453, sec. 17) : " That the constitution and laws of the United States are hereby extended over and declared to be in force in said ter-

Territory of New Mexico v. Yarberry.

ritory of Utah, so far as the same, or any provision thereof, may be applicable."

It is manifest that Judge Hallett's special reasoning could not find even the semblance of an excuse in the language of the Utah act, and yet it is equally manifest that congress had no other or different intent in the one case than in the other respecting the application of the constitution and general laws.

The true construction, then, of the provision in question is to hold that it put the constitution and general laws of the United States in full force in New Mexico wherever applicable.

The language previously cited from the Indian country act (4 St., 729, sec. 25), declaring the Crimes Act to be "in force" could only be interpreted as putting the act in force according to its terms, and in this application of the Crimes Act to the Indian country its operation in respect to murder, maiming, etc., was not limited to forts, arsenals, or other like establishments, but it extended over each and every part of the Indian country as a "district of country:"  4 How. 567; Hempstead C. C., 27; *Id.*, 478; *Id.*, 483; also *United States v. Guiteau, supra.*

In 1850, at the time of the passage of the New Mexico organic act (9 St., 446), the term "district of country" as used in the Crimes Act had received a most extensive practical interpretation by a series of acts in *pari materia*, declaring the act in force over the vast districts of country purchased from France and Spain (*vide* citations *supra*), and, that at that time, it still furnished the only law of murder for a very extensive territory west of the Mississippi.

New Mexico, so recently the possession of a hostile power, was at that time in no position to claim greater immunity from the sovereignty of the Union than that enjoyed by the Louisiana and Florida territories at the time of their peaceable acquisition, and there was no reason or policy for waiv-

ing in respect to New Mexico that national jurisdiction on the subject of the crime of murder which had theretofore been exercised over all new territory that had come "under the sole and exclusive jurisdiction of the United States."

If any places "elsewhere" were to be referred to in order to determine the "force and effect" of the Crimes Act, they were precisely those districts of country over which the government had thoroughly and effectually applied it, including the vast Indian country in which the act was still in force, as well as the district of Columbia.

With reference to the provision, it is said in a recent case in the Supreme Court of the United States (*United States v. McBratney*, 104 U. S., 621):

"Such a provision has a less extensive effect within the limits of one of the states of the Union than in one of the territories of which the United States have sole and exclusive jurisdiction."

The historical relation of the organization of the territory of New Mexico, to the organization of other territories, is significant as a factor in determining the degree in which congress intended to delegate to the legislative assembly the national sovereignty.

I have already shown that, by reason of its contractual and fiduciary relation to the Union, the northwestern territory was a district *sui generis*—it was land held on an express trust for the formation of new states, and governed upon a system established before the enactment of the Crimes Act, and not intended to be disturbed by the latter. When new territories were formed out of this peculiar domain, it was natural to preserve to them the laws, rights and privileges under which their inhabitants had been educated; and consequently we find these laws, rights and privileges expressly saved to such new territories: Indiana, 2 St., 58; Illinois, 3 St., 514; Michigan, 2 St., 309; 3 St., 769, sec. 2, also sec. 6, repealing inconsistent U. S. laws; Wisconsin, 5 St., 10.

The same policy was naturally followed respecting the territories of Mississippi and Alabama, which were formed out of lands ceded to the Union by some of the states : 1 St., 549 ; 3 St., 371.

Again, some parts of the vast Louisiana purchase were settled by emigrants from the northwestern territory, who carried with them the traditions, laws, and customs under which they had been reared, and who proved to be a very trustworthy class of citizens. Hence it was desirable in providing new territorial governments for these districts of country to permit the inhabitants to retain their old laws and customs and to assimilate their government to that of the government under which their citizenship had developed. With the exception of Orleans, which was quite advanced in civilization (2 St., 322), the only territorial governments affecting the Louisiana purchase, established under these special conditions prior to the organization of New Mexico (A. D. 1850) were, first, that country west of the Mississippi and north of the Missouri, attached to the Michigan territory in 1834 (4 St., 701), and afterwards that of Wisconsin (5 St., 10), Iowa (5 St., 235), and Minnesota (9 St., 403), formed, except a part of Wisconsin, out of the same district. Oregon was equally privileged (9 St., 323).

As to Oregon, that was for a long time a district more or less in dispute between the United States and Great Britain *vide* Treaty 1848, 9 St., 869) ; and it had been settled and considerably developed early in the century through the efforts of men who brought with them the traditions and customs of the east : *Vide* Irving's *Astoria*.

It was therefore advisable to assimilate its territorial government to that of the northwestern territory.

But, in dealing generally with the vast territory acquired from France and Spain—a territory inhabited principally by savages and by unstable whites—congress held a tighter rein. It expressly put the Crimes Act and general laws in force : 2

St., 1804, and amendments ; 3 St., 654, and amendments ; 4
St., 729, sec. 25.

This was the situation when congress passed the organic
act of New Mexico :   9 St., 446.

I have shown the exceptional nature of the organization
of Wisconsin, Iowa, Minnesota and Oregon, the only territo-
ries organized in the interval between the organization of
Arkansas (carved out of Missouri, 3 St., 494), and that of
New Mexico, and I have referred to the express provisions
of the organic acts of the four territories first named, which
grant to those territories exceptional privileges and larger
governmental powers.

But New Mexico—an acquisition by means of hostilities
only lately ended—clearly called for the same cautious politi-
cal treatment as that employed for Loiusiana, Florida and
Missouri.

That the Crimes Act was the only law of murder in force
over the greater part of the national domain is a well known
historical fact.   On this subject, Judge Wells remarked, in
1843 (Hempstead C. C., p. 419), " In the territories of Flor-
ida and Louisiana, and perhaps others, certain laws, includ-
ing the act of 1790, were declared to be in force.   They are
of course yet in force in Florida, and what remains of
Louisiana, as purchased from France ; and I presume in other
territories."   He adds that the Crimes Act was " in full
force " in the territory of Missouri.

Judge Hallett thus proceeds in his second proposition, p.
38 :   " We may reach the same conclusion without referring
to the sixteenth section of the organic act.   In all its legis-
lation congress pursues the authority given in the constitu-
tion, and we may refer the section under consideration to
the sixteenth clause of section 8, article 1, of that instru-
ment.   In that clause of the constitution, congress is invested
with exclusive legislative authority over such district (not
exceeding ten miles square), as may, by cession of particular

states, and the acceptance of congress, become the seat of government of the United States, and like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and their needful buildings. The description of places in the act is nearly the same as in this clause. The words ' fort, arsenal, dock-yard and magazine,' are found in the act and in the constitution, and the words ' other place or district of country,' occurring in the act but not in the constitution, were probably inserted out of abundant caution, or probably they refer to the District of Columbia, which at the time of this enactment had no existence, but was in contemplation." 　*　　*　　*　　" Beyond doubt this law was enacted in execution of the power conferred in this clause of the constitution. Now there is nothing concerning the territories of the United States in this clause: it refers only to the federal seat of government, and to forts, arsenals, etc." 　*　　*　　*　　*　　" The law we are discussing is not more comprehensive than the clause of the constitution upon which it rests, and therefore this territory, as a territory, is not within its descriptive terms."

In this proposition, Judge Hallett fails to consider that, when a statute is enacted to supply a want or to remedy a mischief, the legislating body rarely limits itself to the single subject which moved it to action, but, in acting upon that subject, usually employs language broad enough to cover all cases coming within the same legislative principle.

For instance, in the very act in question, congress, while moved to action by the constitutional clause cited by Judge Hallett, and intending to cover all the cases embraced in that clause, naturally conceived the larger purpose of legislating, not simply for the limited jurisdiction described in the clause, but rather for the entire national jurisdiction ; thus making the enactment commensurate with the political need. Therefore, while the constitutional clause refers only to forts

and other establishments on sites within state limits, and ceded by states to the Union, the Crimes Act is not limited in its terms to forts and other establishments of the class mentioned in the constitution, but it expressly extends to all forts and other national places, even including those which then might be (and which in fact have since been) built on territory acquired under the war power and the treaty power; of which latter class of establishments (not within the purview of the constitutional clause cited), we have many instances in the vast French, Spanish and Mexican cessions.

So, while the same constitutional clause made mention of only one district of country, *i. e.*, such as might be acquired for the seat of government, the Crimes Act, while using terms broad enough to include such a district, evinces no intent to limit its operation to any one special district, but expressly extends to "any district of country" whatsoever: Sedgwick on Construction, p. 198, *et seq.*

Arguing in support of this proposition, Judge Hallett, p. 39, refers to congressional legislation purporting to extend the operation of the Crimes Act, and, having cited the 25th section (*vide supra*) of the Indian Country Act of 1834, he continues: "The Indian country at that time comprised the greater part of the national territory, and congress found it necessary to extend the section we are considering to that country. If the territory of the United States had been within the terms of the law, it would have been in force in the Indian country before the act of 1834, and that enactment would have been unnecessary."

From this language the inference is reasonable that Judge Hallett had not made a thorough historical search on the subject of which he wrote; else he would have become aware that, independently of the self-extending force of the Crimes Act over newly acquired districts of country, that act had been expressly extended to the Louisiana purchase as early

as 1804 (2 St., 283, § 7, cited *supra*); that, as I have shown, congress had been in the habit of repetitious legislation on this subject (Statutes *supra;* also 2 Sawyer, C. C., p. 318), and that the only doubt ever judicially suggested respecting the self-extending force of the Crimes Act over the "Indian country" was based, not on any interpretation of the term "district of country," but on the fact that the "Indian country," being occupied by *quasi* sovereign Indian tribes, who there administered their own laws—"dependent nations" with whom the United States had entered into treaties, binding as "the supreme law of the land,"—was not, so far as so occupied, "under the sole and exclusive jurisdiction of the United States:" Per Wells, J., Hempstead C. C., p. 422; *ubi supra.*

Judge Hallett then considers (pp. 39, 40, 41) the ordinances of 1787, and declares, as I agree, that "ample power was conferred upon the northwest territory to enact a full code of civil and criminal laws, subject only to the limitations contained in the ordinance itself."

He adds: "This ordinance subsequently became the organic law of Illinois, Indiana, Michigan, Mississippi and Alabama territories, which were established after the act of 1790 was passed. The language of the ordinance above set forth undoubtedly conferred authority to enact the law of homicide, and from this it sufficiently appears that congress did not propose to exercise that authority directly and by its own act. Congress certainly did not intend to confer upon these territories authority to do that which it purposed to do or had done itself, and which, being done by congress, could not be modified or in any manner affected by the territories. If the law under consideration was the law of homicide in Illinois and the other territories last named, why should congress confer upon those territories authority to legislate upon that subject?"

I have already referred to the singular *status* of the north-

28

western territory.    It is familiar history that it was a domain conceded to the Union under a special compact which was viewed with peculiar jealousy, not only by the individual states, but also by the large and intelligent population which settled in that territory in expectation of its speedy division into states of the Union, and on the faith of the continuance meanwhile of its pledged form of temporary government.    I have shown why, on familiar principles, the Crimes Act might be held not to repeal by implication any provision of the ordinance.

As to the territories of Illinois, Indiana and Michigan, they having been originally a part of the northwestern territory and subject to the ordinance, good faith and sound policy required that, on their organization as separate territories, their old laws should be continued in force.    And as to the territories of Mississippi and Alabama, they having been originally part of the territory of some . of the states and ceded by them to the Union, on certain conditions, were wisely placed on a footing with the northwestern territory and the various territories carved out of the same :    Statutes *supra*.

This assimilation of the government of certain later territories to that of the northwestern territory, I have already alluded to as exceptional, although politically justifiable for special reasons which I have stated.

In Illinois, Indiana, Michigan, Mississippi and Alabama, specified by Judge Hallett, the Crimes Act law of murder was probably never in full force, because the first three were part of the northwestern territory and the last two were assimilated to that territory, in point of government, immediately on their acquisition :    1 St., 549 ; 3 St., 371.

But there were six territories in which, although the Crimes Act was originally in full force (2 St., 283 ; 4 St., 729, § 25), yet, on the formation of distinct territorial governments, some of the provisions of the Crimes Act were

probably repealed in order that they might enjoy all the privileges of the northwestern territory and its successors—I refer to Iowa, Orleans, Minnesota, a part of Wisconsin, Oregon and Washington.

Thus we find that certain territories were never subject to the full operation of the Crimes Act law of murder; that others, although so subject as parts of the Louisiana purchase, were released from its operation by force of the peculiar phraseology of their organic acts; and that others have always been under its full operation.

The superficial nature of Judge Hallett's research on this subject is seen in his remarks on page 41 : "Again, in an act respecting Florida territory (4 St., 164), in defining the jurisdiction of the superior courts of that territory, it is declared that they 'shall have and exercise original and exclusive jurisdiction of all crimes and offenses committed against the laws of said territory, where the punishment shall be death.' In this country, murder is commonly punished with death, and we do no violence to language when we say that that crime was referred to in the clause we have cited. If so, the law of homicide in that territory was provided, not by the act of 1790, but by the act of the territory. It appears to us that congress has already acted in the belief that the territory of the United States is not a place or district of country under the sole and exclusive jurisdiction of the United States, within the meaning of the law under consideration."

The Florida statute (4 St., 164) cited by Judge Hallett, was passed in 1826, and it does not contain any provisions defining crimes. Congress had already—in the organic act of 1822—most emphatically extended the Crimes Act over Florida (3 St., 654), the ninth section of that act providing "that the following acts, that is to say 'An act for the punishment of certain crimes against the United States,' approved April thirteenth, one thousand seven hundred and ninety,

and all acts in addition or supplementary thereto which are now in force,   *   *   *   shall extend to and have full force and effect in the territory aforesaid." See also opinion of Judge Wells, cited *supra*.

Consequently, having an express statute to inform us as to the law of Florida, in respect to homicide, we are not forced to draw an illogical inference from a statute enacted with no reference to the subject.

Other acts of congress, above cited, show, moreover, that congress has most impressively manifested its belief that the territory of the United States acquired from foreign powers is a " district of country " subject to the United States law of murder : 2 St., 283, and amendments ; 2 St., 743 ; 3 St., 654, and amendments ; 4 St., 729, sec. 25.

Judge Hallett proceeds, on page 42 : " Since the ordinance of 1787 was disused, the language in which legislative power has been conferred upon territories is similar to that found in our own act, which is :

" ' The legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act.'

" More comprehensive language than this could not have been used, and we cannot doubt that it was designed to confer as full authority as that used in the ordinance. Unquestionably the powers conferred upon territories recently established are as full and complete as were those of the territories established under the ordinance. As the power to legislate upon the subject of homicide was conferred by the ordinance, so also it is conferred by our own act, and this, as we have seen, excludes the notion that the law of homicide in this territory is to be found in the act of 1790."

This suggestion still proves the error, above pointed out, of considering all the later territories on an equal footing with the northwestern territory. Even the late Chief Justice Chase fell into a similar error in treating the Wisconsin

organic act (5 St., 10), as the model on which all later terri-
torial organic acts have been drawn :    *Clinton v. Englebrecht*,
13 Wallace, 444.

The Chief Justice failed to notice that the territory of.
Wisconsin was assimilated to the northwestern territory by a
provision in its organic act (5 St., 10, sec. 12), which is
wanting in the organic acts of most of the territories, formed
out of the French and Mexican cessions; the provision
being as follows :

"SECTION 12. That the inhabitants of the said territory
shall be entitled to and enjoy all and singular the rights,
privileges and advantages granted and secured to the people
of the territory of the United States northwest of the river
Ohio, by the articles of the compact contained in the ordin-
ance for the government of the said territory, passed on the
thirteenth day of July, one thousand seven hundred and
eighty-seven, and shall be subject to all the conditions and
restrictions and prohibitions in said articles of compact im-
posed upon the people of the said territory. The said inhabi-
tants shall also be entitled to all the rights, privileges and
immunities heretofore granted and secured to the territory
of Michigan, and to its inhabitants, and the existing laws of
the territory of Michigan shall be extended over said terri-
tory so far as the same shall not be incompatible with the
provisions of this act, subject nevertheless to be altered,
modified or repealed by the governor and legislative assembly
of the said territory of Wisconsin ; and further the laws of
the United States are hereby extended over and shall be in
force in said territory so far as the same or any provision
thereof may be applicable."

Besides, very few of the provisions of the Wisconsin act
first appear in that act. Even the language quoted by Judge
Hallett as that usually employed in conferring territorial
legislative power did not first appear in the Wisconsin act.

Indeed, a historical review of the evolution of the present

usual form of territorial organic acts, confutes absolutely Judge Hallett's argument.

The organic acts of Wisconsin and all subsequently organized territories, including Colorado (12 St., 172), and New Mexico (9 St., 446), may, in respect to their provisions, be summarized as follows:

1st. Declaration of a temporary government, in a defined district of country, under a specified name.

2d. The deposit of executive power with a governor, declared to be *ex officio* commander in chief of the militia and superintendent of Indian affairs, and empowered to approve all legislative acts, to pardon territorial offenses and to reprieve United States offenses; to commission all officers appointed under territorial laws, and to take care that the laws be faithfully executed.

3d. Provision for a secretary to record and preserve legislative and executive acts, to transmit copies of the laws to the president, and to act as vice-governor.

4th. Deposit of legislative power with the governor and a legislative assembly composed of a council and house of representatives to be elected in a manner specified.

5th. Qualifications of voters.

6th. Limitation of legislative power as follows: "The legislative power of the territory shall extend to all rightful subjects of legislation, consistent with the constitution of the United States and the provisions of this act; but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed upon the property of the United States; nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents. All the laws passed by the legislative assembly and governor shall be submitted to the congress of the United States, and, if disapproved, shall be null and of no effect."

7th. Mode of appointment of local officers.

8th. Specification of disqualifications of legislators and United States officers respecting holding certain offices.

9th. Deposit of judicial power with a supreme court, district courts, probate courts, and justices of the peace, and a limitation of jurisdiction, provision for a clerk of each district court, and limitation of right of appeal to Supreme Court of the United States.

10th. Provisions for a United States attorney and marshal.

11th. Provisions for appointment of governor, secretary, chief justice, associate justices, attorney and marshal, by the president with the advice and consent of the senate, oaths of office, salaries, appropriations, etc.

12th. Provisions respecting the first assembly, and other sessions of the legislative assembly.

13th. Provisions for election of a delegate to congress.

14th. Provisions for grant of school lands.

15th. Provisions for judicial districts.

16th. Provisions declaring the constitution and applicable laws of the United States in force.

17th. Bill of rights.

The germ of many of these provisions is found not only in the ordinance of 1787, but in several of the colonial charters and organic laws (1 Story Cons. Book I, *passim*.) But the first assume a form substantially analogous to the present in the organic act of March 26, 1804 (2 St., 283), which may be compared with the later acts above analyzed by reference to the following summary:

1st. There is a similar declaration of temporary government over a defined district.

2d. There are similar provisions respecting a governor and a secretary.

3d. The legislative power is vested in a governor and council, who are declared to "have power to alter, modify or repeal the laws which may be in force at the commencement of this act. Their legislative power shall also extend

to all the rightful subjects of legislation, but no law shall be valid which is inconsistent with the constitution and laws of the United States." There are analogous provisions for reporting laws to congress, and for their nullification by disapproval. "The governor or legislative council shall have no power over the primary disposition of the soil, nor to tax the lands of the United States, nor to interfere with the claims to land within the said territory."

4th. There is an equally broad grant of judicial power, accompanied with provisions respecting judicial sessions, appointment of a clerk, juries, habeas corpus, bail, etc.

5th. There are analogous provisions respecting the appointment of governor, secretary and judges, and respecting official oaths and salaries.

6th. In the seventh section, twenty acts of congress, including the Crimes Act, are enumerated specifically, and declared "to extend to and have full force and effect in the said territories (*i. e.* Orleans and Louisiana).

7th. There are provisions as to a United States district court, and as to an attorney and marshal, and respecting the qualifications of jurors, as well as others not material to this illustration.

In this Orleans act we find a grant of legislative power in language substantially like that employed in all later organic acts, including those of Wisconsin (5 St., 10), New Mexico (9 St., 446), and Colorado (12 St., 172.)

Nevertheless, the provisions of the seventh section (2 St., 283, sec. 7), extending the Crimes Act expressly and putting it in "full force and effect," show beyond doubt that the grant of legislative power by the language in question, was not intended to oust the United States of its jurisdiction over the crime of murder, nor to leave the territory destitute of a law of homicide, should its legislature see fit to decline action on that subject: *Vide* 4 How., 567.

In harmony with all that is here contended for, congress

passed, in 1871, " An act to provide a government for the District of Columbia (16 St., 419), which is strictly modeled on the usual form of territorial organic acts, embracing all the usual provisions, with the addition of many special provisions appropriate to the peculiar situation of the district.

The first section declares that " all that part of the territory of the United States included within the limits of the District of Columbia be and the same is hereby created into a government by the name of the District of Columbia."

The eighteenth section is as follows : " That the legislative power of the district shall extend to all rightful subjects of legislation within said District of Columbia consistent with the constitution of the United States and the provisions of this act ; subject nevertheless to all the restrictions imposed upon states by the tenth section of the first article of the constitution of the United States ; but all acts of the legislative assembly shall at all times be subject to repeal or modification by the congress of the United States, and nothing herein shall be construed to deprive congress of the power of legislation over said district in as ample a manner as if this law had not been enacted."

Of course this exception to the grant of legislative power was unnecessary, since it would have been implied by law : (101 U. S., 129.)

The thirty-fourth section contains the words construed with reference to the Crimes Act in *U. S. v. Guiteau, supra*, viz. :

" The constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within the said District of Columbia as elsewhere within the United States."

From the time of the enactment of the first Orleans organic act, we observe a disposition on the part of congress to conform all new territorial organic acts to the same standard ; the first idea in each case being to preserve in full force and effect over the new territory the constitution and general

laws of the United States, and the next idea being to confer upon the newly created territorial legislature the power to enact laws consistent with the constitution and not repugnant to the existing laws of congress, which being general in their nature and evincing a uniform policy over all the territories not already provided with laws on the same subjects ought to prevail. In this connection, it is to be observed that wherever congress has favored new territories, by putting them on a footing with the northwestern territory, it has invariably by the organic acts immediately applied a full code of laws, criminal and civil, to such new territory, by adoption, either directly from the northwestern territory, or mediately from some territory formed on the model of the latter and already having a sufficient code; and it would be vain to search the national statutes for any instance in which congress has left a territory in a state of anarchy, in respect to any of the high crimes mentioned in the Crimes Act.

It is also worthy of remark that, in the early days of territorial governments, the sovereignty of the Union was more cheerfully acknowledged than it was after the slavery agitation gave birth to the doctrine of "squatter sovereignty" so called; and, accordingly, all prosecutions were conducted in the name of the United States, whether for crimes in violation of acts of congress or for crimes in violation of territorial acts. See cases in Hempstead, pp. 30, 61; Morris (Iowa), pp. 164, 341, 412; also, 1 Wisconsin, pp. 73, 93, 124, 276, 841. And indictments for such offenses properly conclude "against the peace and dignity of the United States:" *United States v. Lemmons*, Hemp., 62.

And, at the present day, notwithstanding the practice of prosecuting territorial crimes in the name of the territory, the highest governmental officers, executive and judicial, are, as I am advised, of opinion that, within the meaning of the pardon clause of the constitution, all territorial offenses are offenses against the United States: *In re Edward M. Kelley.*

. Wherever there is a general statute of the United States that can reasonably be applied to the territories, every intendment is in favor of the intention of congress under that statute to assert the sovereignty of the Union, rather than to commit the exercise of that sovereignty to any delegated authority: *Vide National Bank v. County of Yankton*, 101 U. S., 129.

Especially ought this principle to be applied in the case of statutes declaring high crimes like treason and murder.

It seems absurd to hold that congress, while deeming it important in 1862 to pass the Bigamy Act (U. S. R. S., § 5352), and in 1873 to pass the Obscene Literature Act (U.S. R. S., § 5389), both expressly extending to the territories, and referring to them as places under the exclusive jurisdiction of the United States, and while having expressly extended the Crimes Act to the Louisiana and Florida purchases (2 St., 283, § 7; 3 St., 654, § 9), should have been willing to waive the jurisdiction of the Union over the crime of murder in the territories acquired from Mexico and Russia.

These provisions in the Revised Statutes clearly imply that a territory is a "place" within the meaning of the provisions, just as the Indian country act (4 St., 729, § 25) implies that the word "place" in the Crimes Act is applicable even to so extensive a district as the Indian country.

There are some old records in the office of the clerk of the district court of the first district which tend strongly to confirm the views which I have expressed regarding the force of the constitution and general statutes of the Union in newly acquired territory, and even to suggest a greater efficacy than I have imputed to them.

Among these records are the indictment, verdict, death sentence, and other proceedings in the case of *The United States v. Antonio Maria Trujillo*, from which it appears that as early as March 9th, A. D. 1847, under the provisional government and even before the treaty of peace, a grand

jury of New Mexico, in the name of the United States, indicted the defendant for the crime of treason, charging, among other things, that he did in New Mexico " levy and make war against the said government of the United States and did then and there maliciously and traitorously attempt and endeavor by force and arms to subvert and destroy the constitution and laws of the government aforesaid in contempt of the constitution and laws of the government aforesaid," etc.

It was under this indictment that the defendant was convicted and sentenced to be hanged, which sentence was probably carried into effect on the 16th day of April, A. D. 1847.

The proceeding was evidently under the Crimes Act of 1790, for the violation of that act and of the United States constitution.   As a writer in the New American Cyclopædia (15 Appleton, p. 583) well observes, with reference to the crime of treason—" the foundation of the law itself and of our knowledge of it must be the clause in the constitution *

*   and, as there is no common law of the United States, this clause would have remained inoperative but for the act of 1790, chap. 36, sec. 1."

Another of these old records is entitled *United States v. John Armstrong*, and is an indictment and proceedings thereunder, against the defendant for committing murder in a "cantonment" of United States troops at Taos.   The prosecution was evidently founded on the provisions of the Crimes Act of 1790.

Judge Hallett says at page 43 :   " As the laws of congress can be better enforced than those of the territory, we would be glad to adopt a different view, if it were possible to do so, but we cannot indulge our wishes or preferences in opposition to the law."

There can be no doubt of the wisdom and policy of applying the Crimes Act to cases of territorial homicide, if the law will justify the application.   I have sought to show that

the law, properly interpreted, not only justifies this application, but denounces as a gross heresy the prevailing territorial opinion; and, I add, in conclusion of this subject, that the same suggestions of wisdom and policy, which, according to Judge Hallett, lead to the judicial wish to hold the Crimes Act in force, must have been controlling with congress to prevent its repeal or degradation.

The territorial law of homicide is unconstitutional. The organic law is the territorial constitution. Any legislation in conflict therewith is void *ab initio.* No disaffirming act of congress is necessary to establish this invalidity; and the failure of congress to expressly disaffirm is immaterial. A disaffirmance by congress is in such case supererogatory; and it is absurd to attempt to uphold such legislation on the bare negative that congress has taken no action on the subject.

In *Goodbe v. Salt Lake City,* 1 Utah, 79, it is said by McKean, Ch. J., respecting a statutory provision then under judicial consideration, "If, in any particular, this provision conflicts with the organic act, in such particular it is null and void, unless it has been affirmatively approved by congress."

So, in *Smith v. Odell,* 1 Wisconsin, 449, it is said in the opinion (pp. 454, 455): "The act of congress organizing this territory is in the nature of a constitution of a state. It is supreme and the legislative assembly cannot pass an act in opposition to or in violation of it. The courts cannot be required to enforce such an act. It should be treated as a nullity."

To the same effect is *Cass v. Davis,* 1 Col., 43, and, quite recently, Associate Justice Bell, while holding the Socorro district court, disregarded, as violative of the organic act, a statute which had been enacted by the territorial legislature nearly thirty years ago.

It requires no argument to show that a law of congress, applicable to this territory, is supreme and cannot be invaded, avoided or nullified by a territorial act. It is evident that

when the will of congress is once declared, the legislative assembly can set up against it no other will on the same subject of legislation.   As Judge Hallett well observes (1 Col., p. 40), any territorial law, "so far as it should correspond with the federal law would have been unavailing, and so far as in conflict with the federal law, it would have been void because of its repugnance thereto."

The judgment of this court, not being forestalled by any authoritative adjudication on the point here presented, the court is in duty bound to examine the question fully and as freely as if this case had arisen for discussion immediately after the enactment of the organic act.

As the highest appellate court in the territory it is called upon to decide the question upon principle, according to its judicial conscience, untrammelled by the ignorance and prejudice of the past.

The question never having been raised before in this court or in the Supreme Court of the United States, the rule of *stare decisis* is not applicable as an artificial obstacle to truth and justice.

With reference to the authority of precedents, there exists "an obvious distinction between the cases where the point decided was not the leading or chief point in the cause; where it did not receive full discussion at the bar, or was incidentally decided, without full examination, and those cases where the point in question was singly presented, fully discussed by counsel, and distinctly passed upon by the court:" *Olcott v. Tioga R. R. Co.*, 26 Barb., 158.   See also opinion Denio, J., in same case, 20 N. Y., 226 ; *Justice v. Lang*, 52 N. Y., 325.

A learned judge has said (Johnson, J., 4 Cranch., pp. 103, 104) : "I am far, very far, from denying the general authority of adjudications.   Uniformity in decisions is often as important as their abstract justice.   But I deny that a court is precluded from the right, or exempted from the necessity, of

examining into the correctness or consistency of its own decisions, or those of any other tribunal. If I need precedent to support me in this doctrine, I will cite the example of this court, which, in the case of *The United States v. Moore*, February, 1805, acknowledged that in the case of *The United States v. Sims*, February, 1803, it had exercised a jurisdiction it did not possess. Strange, indeed, would be the doctrine that an inadvertency once committed by a court shall ever after impose on it the necessity of persisting in its error. A case that cannot be tested by principle is not law, and in a thousand instances have such cases been declared so by courts of justice."

*William Breeden*, Attorney-General, for the appellee:

1st. There was no error in excluding the question asked the witness Greenleaf. It referred to a remark made by deceased, not to or in the presence of the defendant, and it was not disclosed in any way that the remark in any way affected or referred to the defendant, or that, if so, it was ever communicated to the defendant. The evidence of Greenleaf clearly shows that the remark which the question sought to bring out, could not be of the *res gestœ* of the case or in any way proper or material to the defense.

It was not a part of or made in connection with the meeting with the defendant by the deceased, and deceased and defendant had no feud or quarrel: Wharton's Crim. Evidence, 262.

2d. The question asked Ronan was with reference to a remark by defendant, upon hearing a shot fired some moments before the shooting of the deceased, when it was not known who fired the shot, and the record does not show that it could in any way be material or proper evidence in the case. It was not of the *res gestœ*: Wharton's Crim. Evidence, 262.

3d. The question asked the witness Armijo, as to what the defendant said about the shooting four or five minutes after it occurred, was properly excluded. The statements of de-

fendant at that time were not admissible for defense, and he could not be permitted to make evidence for himself of statements made by him after the commission of the act, and after he had had time for consideration and to prepare a story, it was not of the *res gestæ*: Wharton's Crim. Evidence, 262, 690.

4th. The ruling of the court on the motion for a new trial is not reviewable, as has been repeatedly decided in this court.

The newly discovered evidence referred to in the motion for a new trial was merely cumulative and tending to show, if anything, only an alleged fact of which direct evidence had been given to and considered by the jury.

5th. The minutes of evidence in the record show that there was evidence that the defendant and Boyd were acting together, and besides it is. not pretended that all the evidence in this case was preserved or is before this court.

Therefore, it must be held that the fifth instruction asked by defendant was properly refused.

6th. The charge of the court was unexceptionable and no objection was made or exception taken to any specific portion thereof, but only a sweeping general exception to the whole charge, which this court cannot consider.

It was the province of the court to give the jury the law applicable to the facts of the case, which was done.   There was no error in the failure of the court to instruct as to second, third and fourth degrees, and there was no exception taken on that account.   The instructions given as to justifiable and excusable homicide, comprehended all that the defendant was entitled to:   6 Cal., 214; 29 Cal., 507 ; 32 Cal., 280 ; 31 Mo., 147 ; 18 Texas, 343 ; *Territory v. Romine,* *ante,* p. 114 ; *Territory v. Young, ante,* p. 93.

7th. The Crimes Act of the United States does not apply to cases like this.   This indictment was properly brought and prosecuted in the name of the territory.   New Mexico is

not a district of country under the exclusive jurisdiction of the United States in the sense of the Crimes Act of 1790 : *Franklin v. The United States*, 1 Col., 35.

It is too late to object to the constitution of the grand jury or the qualifications of jurors for the first time in this court. Any objection to the jury or jurors which may have existed, was waived by defendant when he assented to go to trial without objection : 1 Bish. Crim. Law, 995, *et seq.*, particularly 997 and authorities there cited ; *Territory v. Romine*, New Mexico Supreme Court, Opinion, Book ; 1 Bish. Crim. Proced, 895, *et seq*, and particularly 887, authorities cited ; Wharton's Crim. Pleadings and Practice, 350, *et seq.*

The only question properly brought into this court by defendant's exceptions is the exclusion of one question to witness Greenleaf, one to Armijo and one to Ronan. The general question of jurisdiction is proper to be considered. But the court can properly consider none of the other questions suggested in the assignment of errors and brief for the reason that they are not brought into this court so as to be reviewed.

The instructions were liberal to the defendant, and fairly stated the law of the case, and the case was fairly submitted to the jury upon the evidence before them.

The judgment should be affirmed.

AXTELL, Chief Justice : The defendant, Yarberry, was indicted for murder in the second district court of the county of Bernalillo, May term, A. D. 1882.

He was tried at the same term, convicted of murder in the first degree and sentenced to be hung ; he appeals to this court, and urges particularly the following reasons why he ought to be granted a new trial :

The first reason given is " that the court had no jurisdiction of the person or subject-matter, and the indictment is void on its face for lack of jurisdiction, the said indictment

part of the said record is not in the name of the United
States of America, for the violation of section 5339 of the
United States Revised Statutes, and the indictment is fatally
defective because it is drawn in the name of the territory,
for violation of the territorial law, instead of in the name
of the United States for violation of the act of congress
relative to the crime of murder."

The organic act establishing a territorial government for
New Mexico was approved September 9th, 1850.

It has now been in force over thirty-two years, and has
been acquiesced in during all that period by every depart-
ment of the general government. As early as the December
term, 1857, in the case of *Leitensdorfer v. Webb*, the Supreme
Court of the United States recognized the validity and bind-
ing force upon them of this organic act.

The court says : " It was undoubtedly within the compe-
tency of congress to define directly by their own act the ju-
risdiction of the courts created by them, or to delegate the
authority requisite for that purpose to the territorial govern-
ment. This power," they continue, " we consider, was in
fact delegated by congress to the territorial government by
the seventh section of the act of 1850, which declares that the
legislative power of the territory shall extend to all rightful
subjects of legislation, consistent with the constitution of
the United States and with the provisions of this act:" 20
Howard, p. 177. Congress in the exercise of its undoubted
right to govern the territories, has deemed it inconvenient or
inexpedient to provide a body of municipal laws for them,
but has erected territorial governments and delegated to
them authority to enact such laws : *Franklin v. United
States*, 1 Col., 35.

A year prior to the decision in *Leitensdorfer v. Webb*,
which went up from this territory, the celebrated Dred Scott
case had been decided, the venerable Chief Justice Taney
delivering the opinion of the court. This great judge does

not limit congress in their power to govern territories to the clause of the constitution which enables them to make all needful rules and regulations respecting the territory or other property belonging to the United States, but puts it on the broad ground of sovereignty. "The right to govern is the inevitable consequence of the right to acquire territory." As to form of territorial government he says: "In some cases a government consisting of persons appointed by the federal government would best subserve the interests of the territory." In other instances it would "be more advisable to commit the power of self-government to the people who had settled in the territory, as being most competent to determine what was best for their own interests:" 19 How., pp. 443–449. The expression in this opinion "to commit the power of self-government to the people" is the equivalent of "delegate the authority requisite," used in *Leitensdorfer v. Webb.*

Strictly within the limits of this grant of power, the legislature of New Mexico has declared that the unlawful killing of a human being with premeditated design to effect death is murder in the first degree, and that any person convicted of the same shall suffer death. This statute is consistent with the constitution and laws of the United States. It would be inconsistent with the foregoing reasoning to hold that New Mexico is either a fort, arsenal, dock-yard, magazine or district of country under the sole and exclusive jurisdiction of the United States. We therefore conclude that this indictment was properly found in the name of the territory of New Mexico for violation of territorial law.

The second class of objections are to the grand and petit jurors. These were not taken till after trial and conviction, and cannot now be considered: *Territory v. Abeita*, 1 N. M., p. 546; 1 Bishop, pp. 875–887; Wharton's Criminal Pleadings and Practice, p. 350, and authorities there cited.

The third class of objections is to conduct of trial, par-

ticularly as to ruling out certain evidence offered by defendant. Before proceeding to consider these objections it will be proper to state some of the facts of the case; for it is only by reference to the facts that the rulings of the court below can be clearly understood.

The evidence shows that the defendant, Milton Yarberry, was at the time of the homicide acting as a peace officer in the city of Albuquerque, where the killing occurred. That it was within the scope of his duties to prevent the carrying and using of deadly weapons by persons other than peace officers; that by the statutes of New Mexico it is a misdemeanor to carry such weapons, and all peace officers are required to arrest and disarm persons unlawfully carrying or unlawfully using the same in towns or cities; that, on the night when the homicide was committed, Yarberry and a person by name of Ronan, and another by name of Boyd, were together, when they heard a shot fired down the street some doors below them. They did not start immediately in the direction whence the shot came, and Yarberry said something to one of these men just before he went in the direction where the shot was heard. The defense asked this question:

"Mr. Ronan, please state what was said by Yarberry, the defendant, when his attention was attracted to where this first shot was fired immediately preceding this occurrence?"

On objection, this question was ruled out. Yarberry and Boyd went down the street to where the shot was heard. It was between 8 and 9 o'clock at night, a number of men were in the vicinity, the deceased, Charles Campbell, was walking slowly along from where the shot was fired. Yarberry called out to him to stop, and to hold up his hands, and at the same instant Yarberry and Boyd commenced firing at Campbell, he fell forward on his face and instantly expired, pierced by six balls, all from behind—all entering his back. Yarberry did not go to the body of the dead man.

but turned and went into a saloon. At this point the second question asked was excepted to as follows : " The court below erred in ruling that it was not competent or relevant for the appellant to show what statement he had made to the sheriff, Perfecto Armijo, on the occasion of the appellant's arrest by the latter four or five minutes after the occurrence in question, in answer to the question of the latter, ' What is the trouble, Milt ?' " The third question asked was as to what deceased said a short time prior to the shooting. It is in evidence that the prisoner and deceased were strangers to each other. This is the statement of the prisoner himself. The question is as follows : On the direct examination of J. H. Greenleaf, a witness on behalf of the defense, witness testified that a short time before the occurrence of the shooting which resulted in the death of Campbell, the deceased was in his (witness') father's saloon, and witness was then asked to state what occurred there at that time ; to which question he answered : " Well, he was in there, and he shook the dice with my father for drinks, and my father beat him. My father asked him to pay for the drinks, and he said·:" Objected to on the ground of irrelevancy ; objection sustained. The first two questions relate to what the prisoner said a short time before and a short time after the shooting. It is claimed by defendant's counsel that they ought to have been admitted as part of the *res gestæ*. " The general rule as to *res gestæ* is that all declarations made at the same time the main fact under consideration takes place, and which are so connected with it as to illustrate its character, are admissible as original evidence, being what is termed a part of the *res gestæ*, in other words, a part of the thing done." The cries of the bystanders while the thing is being done are original, and not hearsay evidence, because they are part of the *res gestæ*, but a defendant may not manufacture evidence for himself, either before or after or in the moment of the assault, and claim its admission under this head, and in no

just sense can words spoken several moments before or after the event be considered a part of the thing done.    We think the objections to these questions were properly sustained.

It was sought to introduce the testimony of Greenleaf to show declarations of Campbell and his motives, but we cannot see what this can possibly have to do with the case : he was not acquainted with Yarberry, and it is not claimed by defendant that he had committed or attempted, or threatened to commit any felony, nor that his words, whatever they were, came to the ears of Yarberry.    All this conversation was clearly irrelevant, and no error was committed by the court in excluding it.    The defendant's counsel calls our attention to the case of *Wiggins v. People*, 3 Otto, Supreme Court Reports, p. 465.    A portion of the syllabus is as follows :

" In a trial for homicide, where the question whether the prisoner or the deceased commenced the encounter which resulted in death is in any manner of doubt, it is competent to prove threats of violence against the prisoner made by the deceased, though not brought to the knowledge of the prisoner."    The reason assigned for admitting these uncommunicated threats is to aid the jury in determining the question who fired the first shot.    But it must be remembered that Yarberry and Campbell were strangers to each other, and also that there was no offer to prove that deceased made any threats of violence against the prisoner.

The fourth class of objections relate to the charge of the learned judge who tried the case.    After referring to the charge as a whole, the prisoner, by his counsel, excepts to each and every part of said charge and does not except to any particular error in law in said charge.    Our rules require that he should specify distinctly the several matters in law to which he excepts ; otherwise this court will not consider such general exceptions.    Upon argument before us it was contended that the judge erred in limiting the jury to murder

in the first degree, or in effect stating to the jury that the
evidence showed either a murder in the first degree or a
justifiable homicide. We cannot see by a careful considera-
tion of all the charges asked by defendant and given by the
court that the prisoner's counsel took any other view of the
case, or requested the court to instruct the jury in any other
manner. The facts and the law applicable to them were
fairly before the jury and we cannot see that they were mis-
led. All of defendant's instructions were given except the
fifth, which is in the following language :

" The court further instructs the jury that if you have a
reasonable doubt growing out of the evidence as to whether
or not Milton Yarberry, the defendant, inflicted mortal
wounds upon Charles Campbell, which caused his death, you
must acquit the defendant."

It will be necessary to consider the evidence in this case
somewhat farther before determining whether this instruc-
tion was properly refused. The record shows that the de-
ceased was walking slowly along the street between 8 and 9
o'clock of a clear but not moonlight night, the lights from
the stores were bright, and he was distinctly seen by two
persons who were smoking their cigars on a platform in front
of a store not thirty feet from him. These witnesses testify
that they heard a cry : " Hold up your hands !" Then turn-
ing their eyes in the direction from which the command
came they saw two men, Yarberry and Boyd, some thirty
feet behind the deceased, and one of these witnesses, a mer-
chant of the city, testifies that he recognized Yarberry's
voice as giving the command, " Hold up your hands." At
the same instant these two men commenced firing upon de-
ceased, as rapidly as they could pull trigger—as many as ten
or twelve shots were fired instantly ; six of them entered the
body of Campbell, all from behind ; he fell forward on his
face, and was a dead man before anyone reached him. Both
of these witnesses testify that deceased did not have a pistol,

did not even turn his body, but only looked back over his shoulder. Yarberry did not go to the body, but turned into a saloon. A citizen asked him : "Milt, why did you do this ?" He replied : "I did it, and there he lies." To another he said : "He shot at me, but I was too quick for him, and I downed the son of a bitch." As this case presents a state of society which is now nearly impossible, and will soon become incredible, it may be well to say that where all persons are presumed to be armed, the order, "Hold up your hands," is to prevent an assaulted person from seizing his pistol, usually carried at his hip. The command is not only given by officers making an arrest, but also and more generally by highwaymen—and in the eloquent language of the attorney-general, "The cry was the cry of a robber, and the shot the shot of an assassin." Yarberry, in his own testimony, says that he first called "stop! I want you, that Campbell ;" then "went for his pistol," and said, "go back ;" I then, continued Yarberry, "fired at him, and he fired at me ; I do not know who fired first." There is no dispute but what Yarberry shot him several times. Boyd, who was with Yarberry, also shot him. There were six bullets entering his body, all from behind, all coming out in front. He was instantly shot to death, shot through and through by these two men, one of them a peace officer ! both of them assisting each the other, to make an arrest of a man for a supposed misdemeanor ! The evidence is conclusive that Yarberry and Boyd acted in concert. They were in pursuit of a common purpose and were each responsible as principals.

As the instruction, if given, would have put the jury upon an unnecessary inquiry and tended to confuse their minds, we think it was properly refused. The point raised as to the original verdict as given in the Spanish language we cannot consider, for it is not a part of the record. The newly discovered evidence, the finding of some pistol cartridges upon the person of deceased, has a tendency to strengthen some

testimony that the deceased was armed at the time of his death, but is merely cumulative and would not justify the granting of a new trial. Yarberry's statement was that he attempted to arrest this man, that the man turned and fired upon him; that he returned the shot and killed him. Had the jury believed this statement they would have acquitted him. They disbelieved it and found him guilty. The evidence discloses a case either of justifiable homicide or willful and deliberate murder.

The jury have passed upon it and we are not disposed to disturb their verdict. As to the objection that the verdict does not assess the penalty as required by statute, we are disposed to take the view that it does assess it.

The verdict is in the following language: " We, the jurors, unanimously find the defendant guilty, as charged in the indictment." The statute provides as follows: " All questions of fact in a criminal case shall be tried by a jury, who shall assess the punishment in their verdict, and the court shall render judgment accordingly." In finding the prisoner guilty, as charged in the indictment, the jury instructs the court exactly what judgment to render. The indictment charges murder in the first degree. The law which binds the jury as well as the court, assesses the penalty to be death. To assess this penalty in words would be surplusage, to assess any other on this finding, would be illegal. This question has, however, been settled by previous descriptions of this court, which are here affirmed: *Territory v. Romine, ante,* p. 114; *Territory v. Young, ante,* p. 93.

The only remaining question relates to the presence of the prisoner in court during his trial. It is a well established practice that in cases of felony the defendant must be personally present during all the proceedings, and must so appear on record. But a formal averment of defendant's presence during trial is not necessary when it can be inferred from the record. We think the record in this

case shows the presence of the prisoner, although not every day by formal averment. At the arraignment the record says: "Now comes the said defendant in his own proper person." At the trial defendant is sworn and gives evidence. This is just as convincing of his presence as a formal statement. On motion for new trial and in arrest of judgment "the defendant in his own proper person moves the court." At the sentence the record says: "Now comes the said plaintiff by her district attorney and the said defendant in his own proper person and by his attorneys." The eleventh specification in the motion for a new trial is in the following words: "The jury was not polled as the defendant had a right to have done, owing to the absence of his counsel, when the verdict was rendered late at night." This is as much a part of the record as if made by the clerk of the court, and we think the averment that his counsel was absent plainly implies that the prisoner was present. The absence of any statement in the assignments of error that the prisoner was not at all times present, raises a very strong presumption that he was so present. But without resorting to presumptions, we think the record shows enough to convince any reasonable mind that the prisoner was personally present in court during all his trial. We are asked to presume that he was not. The contrary doctrine is the true one : That in a court of general jurisdiction all the details of a trial are presumed to be regular and sufficient to sustain judgment until the contrary be shown: *Territory v. Webb, ante,* p. 147.

The judgment of the court below is affirmed.